**CONSOLIDATION COAL COMPANY, Petitioner,**

v.

**Ray MARSHALL, Secretary of Labor, on behalf of David Pasula, et al, and Federal Mine Safety and Health Review Commission, Respondents,**

**United Mine Workers of America, Intervenor.**

**No. 80–2600.**

United States Court of Appeals, Third Circuit.

Argued July 24, 1981.

Decided Oct. 30, 1981.

Rehearings Denied Jan. 5, 1982.

Anthony J. Polito (argued), Corcoran, Hardesty, Ewart, Whyte & Polito, Pittsburgh, Pa., for petitioner.

Linda Leasure (argued), U. S. Dept. of Labor, Arlington, Va., Ronald E. Meisburg, Michael A. McCord, Counsel, Appellate Litigation, T. Timothy Ryan, Jr., Sol. of Labor, Washington, D. C., Cynthia L. Attwood, Acting Associate Sol., U. S. Dept. of Labor, Arlington, Va., for respondent.

Lawrence Chaban (argued), Kenneth J. Yablonski, Yablonski, King, Costello & Leckie, Washington, Pa., for United Mine Workers.

Before ADAMS, HUNTER and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

Consolidation Coal Company ("Consol") petitions for relief from a final order of the Federal Mine Safety and Health Commission ("Commission") directing the reinstatement of David Pasula with backpay. This court has jurisdiction pursuant to section 106 of the Federal Mine Safety and Health

Act of 1977 (the "Mine Act"), 30 U.S.C. § 816(a) (Supp. III 1979). Pasula walked off the job while operating a continuous miner machine at one of Consol's coal mines. He alleges that he did so in a good faith belief that there was a danger to his health and safety. Pasula was dismissed. He filed grievances challenging his dismissal for cause and alleging that he had been dismissed for exercising his safety rights. An arbitrator denied Pasula's grievances, and the Arbitration Review Board affirmed. The Secretary of Labor then filed complaints on behalf of Pasula and several other miners employed by Consol alleging unlawful discrimination by the company on account of the Pasula incident. One complaint was filed on behalf of William Kaloz, Ralph Palmer, James Colbert and Bryan Plute which alleges that they were discriminatorily laid off when they were sent home prior to the normal termination of their shifts of work on May 31 and June 1, 1978. Another complaint was filed on behalf of Lawrence Carden which alleges that he was discriminatorily laid off when he was sent home prior to the normal termination of the midnight shift on June 1, 1978.

Following a hearing, an administrative law judge ("ALJ") of the Federal Mine Safety and Health Review Commission held that Consol had unlawfully discriminated against Pasula by discharging him for complaining about a mine safety and health violation and that Consol's action was thereby in violation of section 105(c)(1) of the Mine Act. Accordingly, the ALJ ordered reinstatement and appropriate compensation. The Commission affirmed the ALJ's decision on the ground that Pasula was properly exercising his right to walk off the job, given to him by the Mine Act.

While Pasula may have had a right to walk off the job pursuant to section 105(c)(1) of the Mine Act, because of a good faith belief that there was a danger to *his* health and safety, he went further and shut down the continuous miner machine so that no one else on his shift could work. Pasula did not have a right to close down the continuous miner machine in such a manner. His dismissal, which the record shows was premised not on his walking off the job but on his closing down of the continuous miner machine, was thus not in violation of the Mine Act and the Commission's decision is therefore reversed.

## FACTS

David Pasula was employed by Consol as an operator of a continuous miner machine.[1] At the start of the midnight shift on June 1, 1978, Pasula reported to work at Consol's Montour 10 underground coal mine. Upon arrival at the 1 Northeast section, Pasula checked his continuous miner machine prior to beginning the first cut. Upon starting the machine he noticed that its pump motor was unusually noisy. The machine had been damaged previously in a roof fall. In order to repair the miner, Consol's mechanics had replaced several gears. The excess noise was being caused by the failure of some newly replaced gears to mesh smoothly with the old gears. After operating the machine for approximately an hour and a half, Pasula stopped the machine and complained that the noise was giving him a headache, hurting his ears, and making him extremely nervous. Appendix at 79a, 86a, 94a–95a, 128a, 203a, 231a. Pasula immediately told Consol about the noise and about his problems by requesting the shift foreman, Earl Neal, to take a dosimeter reading to determine the noise level around the machine. In addition, Pasula informed the section foreman, Richard Humanic, that because the excessive noise was hurting his ears, he had turned off the machine while waiting for a dosimeter reading to be tak-

---

1. A continuous miner machine is a large hydraulically powered machine equipped with a drum housing sharp, rotating bits which cut the coal directly from the coal seam. The continuous miner machine retrieves the broken coal, channels the coal over a conveyor running the length of the machine, and subsequently loads the coal onto shuttle cars. The continuous miner machine replaces the undercutting, drilling, and blasting phases of the conventional mining system. *See A Dictionary of Mining, Mineral & Related Terms*, United States Department of the Interior, 1968.

en. Humanic directed Pasula to perform alternate work in another area of the mine, which Pasula proceeded to do.

Shortly thereafter, Earl Neal, James Bigley, Consol's assistant master mechanic, and John Cushey, the union's designated safety committeeman, arrived at the machine. They listened to the motor of the machine while it idled for a period of three to five minutes. Appendix at 80a, 211a. The machine's three other motors were not operating, nor was the machine cutting or loading coal. The safety committeeman took no noise level reading but, after listening to the machine for a few minutes, agreed with Consol (Neal and Bigley) that the machine was not so loud as to be unsafe. When Pasula returned, the shift foreman advised him of his opinion and directed Pasula back to work.

At this point, Pasula became extremely upset.[2] He again expressed his concern about exposure to excessive noise, and refused to continue operating the machine until a noise reading was made. Pasula requested alternative work and volunteered to perform the dosimeter reading himself. He also requested that the Company call a federal mine inspector to monitor the noise. The shift foreman, Neal, refused Pasula's requests and also denied him use of the mine telephone to call an inspector. Consol management once more asked Pasula to return to work and operate the machine. Pasula refused, and again demanded that a noise level reading be taken.

It was at this impasse that Consol management personnel (Neal) attempted to turn to Pasula's helper, John Fischer, with whom Pasula alternated in making cuts, to ask him to operate the machine. However, before Fischer had any chance to respond Pasula slapped the machine, cursed, and declared "nobody's going to operate it."[3] Appendix at 83a–84a, 17aa–173a, 204a–205a, 228a–229a. Pasula acknowledged on the record that he intended to include Fischer in his directive that no one was going to run the machine and that Fischer declined to operate the continuous miner machine only after Pasula had made this statement. After this incident, Neal then took Pasula and Fischer out of the mine and told Humanic, the section foreman, to bring the other members of the crew out as well. Because no one else in the crew besides Fischer and Pasula was qualified to run the continuous miner machine, no coal was produced that shift after Pasula shut the machine down.

On the day of June 1, the superintendent investigated the incident. The investigation resulted in Pasula being given a letter on the morning of June 2 advising him that he was being suspended with intent to discharge. The letter stated in pertinent part:

Management has concluded that your insubordination (refusal to perform assigned duties), interference with management of the mines and causing an unnecessary interruption in production and your past disciplinary record cannot be tolerated. . . .

Appendix at 327a. Pursuant to the National Bituminous Coal Wage Agreement of 1978 ("the Wage Agreement")[4], a hearing—was held on June 5, 1978, and Pasula received a formal letter advising him of his discharge after the hearing.

---

**2.** According to Bigley, "He [Pasula] come [sic] unglued . . ." Appendix at 172a.

**3.** Fischer testified that Pasula "said the machine was down." Appendix at 131a. Contrary to the position of the dissent (at page 1225), Pasula's statement does not leave any room for argument on the part of Fischer. His intent to close down the continuous miner machine was obvious. The statement is not equivocal. It is clear and unambiguous.

**4.** The first grievance stated: "I grieve the suspension with intent to discharge, 'effective immediately,' given to me on June 2, 1978. I was merely exercising my individual safety rights under Article III, Section (I), which were denied me." Appendix at 329a. The second grievance specifically alleged that Pasula had been discriminated against: "I am filing this grievance under Art. III Section (i) because I was denied my Individual Safety Rights also I was *discriminated* against by management on the midnight shift June 1, 1978. I am requesting that I be reinstated to my job and made whole for all lost wages." Appendix at 330a.

## PROCEDURAL HISTORY

This action involves three separate complaints filed by the Secretary of Labor under section 105(c)(1) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 815(c)(1) (Supp. III 1979) which provides in part:

No person shall discharge or in any manner discriminate against . . . a miner . . . because such miner . . . has filed or made a complaint under or related to this Act, including a complaint notifying the operator or the operator's agent . . . of an alleged danger or safety or health violation. . . ."

The Secretary's complaints allege that Consol violated section 105(c)(1) by laying off several miners and by discriminatorily discharging David Pasula following the described incident on the midnight shift of June 1, 1978. Resolution of Pasula's claim dictates the outcome of the additional claims.

Upon his dismissal, Pasula filed two grievances pursuant to the Wage Agreement. Both grievances were submitted to arbitration and a hearing was held on June 19, 1978 before Arbitrator David L. Beckman. At the conclusion of the hearing, Arbitrator Beckman issued an oral decision denying both grievances. He issued his written decision on June 29, 1978.[5] In deciding whether Pasula was justified in walking off the job in this case, Arbitrator Beckman considered the provisions of Article III, Section (i) of the Wage Agreement and judged Pasula's behavior in this case against the higher standard for finding "just cause" set forth under the collective bargaining agreement. That standard, as stated in Article III, Section (i)(1), provides:

No employee will be required to work under conditions he has reasonable grounds to believe to be *abnormally and immediately dangerous to himself beyond the normal hazards inherent in the operation which could reasonably be expected to cause death or serious physical harm* before such condition or practice can be abated.

(Emphasis added.) The Arbitrator concluded that although the evidence supported a finding that there was an abnormal noise in the continuous miner machine, it failed to support a conclusion that the noise was immediately dangerous, nor in his opinion did it support a conclusion that the noise could reasonably be expected to cause death or serious physical harm before abatement. Furthermore, the Arbitrator held that Pasula "had no right under the circumstances to insist that the machine cease production." Appendix at 343a–344a. Thus, he held that Pasula "did not act in good faith" and that "the Company was not arbitrary, capricious or unreasonable in concluding that discharge was the appropriate disciplinary action." Appendix at 343a–344a.

The Federal Mine Safety and Health Commission subsequently issued its complaints, which were consolidated for a hearing before an ALJ. On March 5, 1979, the ALJ issued his recommendation and found that Consol had discriminated against Pasula by firing him because he complained about the safety and health hazard. The ALJ concluded:

I think management had had enough of Mr. Pasula and his health or safety complaints and decided to get rid of him. The other miners on the crew just happen to be caught up in the same situation, but the fact remains that they were punished *i. e.* discriminated against, because of Mr. Pasula's complaint.

Appendix at 35a. The ALJ directed that Pasula be reinstated with backpay.

On April 4, 1979, Consol filed a petition for discretionary review with the Commission. The Commission affirmed the ALJ's findings, but issued its order on a different basis than that relied upon by the ALJ. The Commission found that Pasula had a right to walk off the job and that terminating him because of his exercise of this right was in violation of the statute. Appendix at 56a. Consol appeals pursuant to section 106 of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 816(a) (Supp. III 1979) from the Commission's decision.

---

5. *See* Opinion & Award of Arbitration Proceedings, Appendix at 331a.

## DISCUSSION

The Commission upheld the ALJ's decision on the ground that Pasula had a "right to walk off the job" protected by section 105(c)(1) of the 1977 Mine Act. Although the Commission acknowledges that such a right is not explicitly encompassed by the plain language of the statute, the Commission cites legislative history which it claims indicates that such a right was assumed implicitly in the drafting of the statute. The Commission noted:

We must look to the entire statute, being mindful that the 1977 Mine Act is remedial legislation, and is therefore to be liberally construed.... In determining whether section 105(c)(1) protects Pasula's refusal to work, we consider it important that the 1977 Mine Act was drafted to encourage miners to assist in and participate in its enforcement.... The successful enforcement of the 1977 Mine Act is therefore particularly de-

pendent upon the voluntary efforts of miners to notify either MSHA officials or the operator of conditions or practices that require correction. The right to do so would be hollow indeed, however, if before the regular statutory enforcement mechanisms could at least be brought to bear, the condition complained of caused the very injury that the Act was intended to prevent. A holding that miners have some right to refuse work under the 1977 Mine Act therefore appears necessary to fully effectuate the congressional purpose.

Appendix at 59a–60a. However, because we believe that the record indicates that Pasula was discharged for engaging in the unprotected activity of shutting down the continuous miner machine, and not for exercising his asserted protected right to walk off the job, we find it unnecessary to define the perimeters of that right under the Mine Act.[6] A fair reading of the record indicates

**6.** While the legislative history of the Mine Act shows that there was widespread support for the right of an employee to walk off the job when confronted with dangerous or unhealthful working conditions at the time the 1977 amendments were made, the language of the statute itself (set forth *supra*) does not provide for the right.

Still, the legislative history of the statute arguably supports the giving of such a right to miners. The report of the Senate committee that was responsible for drafting most of the 1977 Mine Act states in part:

*Protection of miners against discrimination*
If our national mine safety and health program is to be truly effective, miners will have to play an active part in the enforcement of the Act. The Committee is cognizant that if miners are to be encouraged to be active in matters of safety and health; they must be protected against any possible discrimination which they might suffer as a result of their participation. The Committee is also aware that mining often takes place in remote sections of the country, and in places where work in the mines offers the only real employment opportunity.

Section 10[5](c) ... prohibits any discrimination against a miner for exercising any right under the Act. It should also be noted that the class protected is expanded from the current Coal Act. The prohibition against discrimination applies to miners, applicants for employment, and the miners' representatives. The Committee intends that the scope of the protected activities be broadly inter-

preted by the Secretary, and intends to include not only the filing of complaints seeking inspection under section [103(g)] or the participation in mine inspection under Section [103(f)], but also the refusal to work in conditions which are believed to be unsafe or unhealthful and the refusal to comply with orders which are violative of the Act or any standard promulgated thereunder, or the participation by a miner or his representative in any administrative and judicial proceeding under the Act.

\* \* \* \* \* \*

The listing of protected rights contained in section 10[5](c)(1) is intended to be illustrative and not exclusive. The wording of section 10[5](c) is broader than the counterpart language in section 110 of the Coal Act and the Committee intends section 10[5](c) to be construed expansively to assure that miners will not be inhibited in any way in exercising any rights afforded by the legislation. This section is intended to give miners, their representatives, and applicants, the right to refuse to work in conditions they believe to be unsafe or unhealthful and to refuse to comply if their employers order them to violate a safety and health standard promulgated under the law. The Committee intends to insure the continuing vitality of the various judicial interpretations of section 110 of the Coal Act which are consistent with the broad protections of the bill's provisions; See, e. g. *Phillips v. IBMA*, 500 F.2d 772 (D.C.Cir.); *Munsey v. Morton*, 507 F.2d 1202 (D.C.Cir.).

that the "real" reason that Pasula was fired was for his shutting down of the machine, and not for his walking off the job nor for his complaints which led to the June 1st incident.

> The Committee also intends to cover within the ambit of this protection any discrimination against a miner which is the result of the safety training provisions . . . or the enforcement of those provisions. . . .

S.Rep.No. 95–181, 95th Cong., 1st Sess., at 35–36 (1977), U.S.Code Cong. & Admin.News 1977, pp. 3401, 3435–3436 ("S.Rep."), *reprinted* in Senate Subcommittee on Labor, Committee on Human Resources, 95th Cong., 2d Sess., Legislative History of the Federal Mine Safety and Health Act of 1977, at 623–624 (1978) ("Leg. Hist."). The matter was also discussed on the floor of the Senate:

> MR. CHURCH. I wonder if the distinguished chairman would be good enough to clarify a point concerning section 10[5](c), the discrimination clause.
>
> It is my impression that the purpose of this section is to insure that miners will play an active role in the enforcement of the act by protecting them against any possible discrimination which they might suffer as a result of their actions to afford themselves of the protection of the act.
>
> It seems to me that this goal cannot be achieved unless miners faced with conditions that they believe threaten their safety or health have the right to refuse to work without fear of reprisal. Does the committee contemplate that such a right would be afforded under this section?
>
> MR. WILLIAMS. The committee intends that miners not be faced with the Hobson's choice of deciding between their safety and health or their jobs.
>
> The right to refuse work under conditions that a miner believes in good faith to threaten his health and safety is essential if this act is to achieve its goal of a safe and healthful work place for all miners.
>
> MR. JAVITS. I think the chairman has succinctly presented the thinking of the committee on this matter. Without such a right, workers acting in good faith would not be able to afford themselves their rights under the full protection of the act as responsible human beings.
>
> MR. CHURCH. I thank the floor managers for their clarification of this matter and for their outstanding work on this very necessary legislation.

Leg. Hist. at 1088–1089. Finally, Representative Perkins, the chief House conferee and chairman of the House committee that drafted a House bill, stated during the customary oral report to the House describing the bill agreed to by the conference committee:

## I.

Consol argues that Pasula's right to refuse to work, or any other right under the statute, for that matter, should be construed and interpreted in light of the con-

> Mr. Speaker, this legislation also provides broader protection for miners who invoke their safety rights. If miners are to invoke their rights and to enforce the act as we intend, they must be protected from retaliation. In the past, administrative rulings of the Department of the Interior have improperly denied the miner the rights Congress intended. For example, *Baker v. North American Coal Co.*, 8 IBMA 164 (1977) held that a miner who refused to work because he had a good faith belief that his life was in danger was not protected from retaliation because the miner had no "intent" to notify the Secretary. This legislation will wipe out such restrictive interpretations of the safety discrimination provision and will insure that they do not recur.

Leg. Hist. at 1356.

Under the circumstances of this case, neither party in their briefs took a position contrary to the existence of a right to walk off the job. Thus, although we need not address the extent of such a right, the statutory scheme, in conjunction with the legislative history of the 1977 Mine Act, supports a right to refuse to work in the event that the miner possesses a reasonable, good faith belief that specific working conditions or practices threaten his safety or health.

In *Phillips v. Interior Board of Mine Operations Appeals*, 500 F.2d 772 (D.C.Cir.1974), the Court of Appeals for the District of Columbia Circuit also acknowledged a right to walk off the job under this statute. The court said:

> The Administrative Law Judge further found:
>
> It is conceded by Respondent that, *pending a resolution of a safety or health complaint, a miner* at the Kentcar Mine *had the right to refuse to work* under conditions which he believed in good faith to be hazardous to his *safety or health.*

Nothing in the Mine Safety Act or mine procedure suggests that the company has a right to fire a miner for refusing to work in a particular area of a mine when he fears a chronic, long-term threat to his health or safety there due to safety violations.

500 F.2d at 780 (emphasis in original). *Accord, Munsey v. Morton*, 507 F.2d 1202 (D.C.Cir. 1974).

The dissent's understanding of our opinion as an evisceration of the putative right to walk off the job is not accurate. At page 1216. Rather, our opinion merely focuses on the particular situation of Pasula in this case. He may have had the right to walk off the job. He did not have the right to close down the entire shift.

tract agreed to by Consol and UMWA. Specifically, Consol contends that once the union safety committeeman agreed with Consol that a danger of sufficient gravity according to the terms of the contract did not exist, Pasula should a *fortiori* have had no right to walk off the job under the 1977 Mine Act.

■ The problem arises because the contractual rights regarding safety are limited to a narrow class of hazards—those that are "abnormally and immediately dangerous ... beyond the normal hazards inherent in the operation which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated." The Commission properly refused to construe the 1977 Mine Act to limit a miner's refusal to work only to such extreme conditions.

■ The Commission held that the ALJ did not err in according little or no weight to the arbitrator's findings. We agree with the Commission that the decision of how much weight an ALJ should accord to an arbitrator's decision should be left to the discretion of the ALJ on a case-by-case basis. *See Barrentine v. Arkansas-Best Freight Systems, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (*"Barrentine"*); *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 60, 94 S.Ct. 1011, 1025, 39 L.Ed.2d 147 (1974) (*"Gardner-Denver"*). It should be emphasized that while this court reaches the same result as did arbitrator Beckman, we do not hold that the arbitrator's decision, which was decided in light of the collective bargaining agreement, was binding on the ALJ or the Commission. These cases support the conclusion that the ALJ was correct in assuming that deferral to arbitration would be most appropriate when the standard under the contract is the same as under the statute.

In *Barrentine* the issue was whether an employee could bring an action in federal district court, alleging a violation of the minimum wage provisions of the Fair Labor Standards Act of 1938, ("FLSA"), 29 U.S.C. § 201, *et seq.,* after having unsuccessfully submitted a wage claim based on the same underlying facts to a joint grievance committee pursuant to the provisions of his union's collective bargaining agreement. The Court held the petitioners' wage claims under the FLSA were not barred by the prior submission of their grievances to the contractual dispute-resolution procedures. The Court reasoned that the FLSA rights that petitioners sought to assert were independent of the collective bargaining process. Such rights were ascribed to the petitioners by the statute as individual workers, not as members of any union, and such rights were not waivable. Citing its decision in *Alexander v. Gardner-Denver Co.,* the Court noted:

> While courts should defer to an arbitral decision where the employee's claim is based on rights arising out of a collective-bargaining agreement, different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers.

101 S.Ct. at 1443.

The Court went on to explain why an arbitrator's decision in such circumstances should not be considered final:

> [E]ven when the union has fairly and fully presented the employee's wage claim, the employee's statutory rights might still not be adequately protected. Because the "specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land," *id.* [415 U.S.] at 57; [94 S.Ct. at 1024]. *See United Steelworkers of America v. Warrior & Gulf Navigation Co., supra,* 363 U.S. [574] at 581–82, [80 S.Ct. 1347, at 1352, 4 L.Ed.2d 1409] many arbitrators may not be conversant with the public law considerations underlying the FLSA.... Moreover, even though a particular arbitrator may be competent to interpret and apply statutory law, he may not have the contractual authority to do so. An arbitrator's power is both derived from, and limited by, the collective-bargaining agreement.... Finally, not only are arbitral procedures less protective of individual statutory rights than

are judicial procedures, *see id.* [415 U.S.] at 57–58, [94 S.Ct. at 1024] but arbitrators very often are powerless to grant the aggrieved employees as broad a range of relief.

101 S.Ct. at 1446–1447.

■ In this case, the considerations underlying the standards of gravity of injury in the Wage Agreement and in the statute are different. The Wage Agreement requires the arbitrator to determine whether the hazard was abnormal and whether there was imminent danger likely to cause *death* or *serious physical harm*. The underlying concern of the Mine Act, however, is not only the question of how dangerous the condition is, but also the general policy of anti-retaliation (against the employee by the employer). Because this is a major concern of the Mine Act, it requires proof merely that the miner reasonably believed that he confronted a threat to his safety or health. Those who honestly believe that they are encountering a danger to their health are thereby assured protection from retaliation by the employer even if the evidence ultimately shows that the conditions were not as serious or as hazardous as believed. Questions of imminence and degree of injury bear more directly on the sincerity and reasonableness of the miner's belief. The Court in *Gardner-Denver* explained:

> In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. . . . Where the statutory right underlying a particular claim may not be abridged by contrac-

tual agreement, the Court has recognized that consideration of the claim by the arbitrator as a contractual dispute under the collective-bargaining agreement does not preclude subsequent consideration of the claim by the National Labor Relations Board as an unfair labor practice charge or as a petition for the clarification of the union's representation certificate under the Act. . . . There, as here, the relationship between the forums is complementary since consideration of the claim by both forums may promote the policies underlying each. Thus, the rationale behind the election-of-remedies doctrine cannot support the decision below.

415 U.S. at 50–51, 94 S.Ct. at 1020–1021.[7] For the reasons stated, we conclude that in this situation the Arbitrator's decision was not binding on the ALJ or on the Commission.

## II.

■ In upholding the ALJ's decision the Commission relied on what it asserted to be the right of miners to walk off the job when confronted with unsafe and unhealthful work conditions. Assuming the existence of such a right, it is still clear that the Mine Act does *not* provide for the right to shut down equipment so that *other* miners may not work. There is no right in the Act to shut down an entire shift's work. An individual is protected by the Act from retaliation for asserting and acting on his real fear that conditions are unsafe or hazardous to his health; but no one has the right to stop others from proceeding to work if they so wish.

The record in this case supports the conclusion that Pasula was discharged because he kept Fischer from working on the machine and thereby stopped the entire shift, as only Fischer and Pasula were capable of

---

7. This court has previously held that because an arbitrator's decision addressed only the contractual questions in dispute and not the statutory issues brought before the National Labor Relations Board, it was not an abuse of discretion for the Board to refuse to defer to the arbitrator. In *NLRB v. General Warehouse*

*Corp.*, 643 F.2d 965 (3d Cir. 1981), we held that it was no abuse of discretion for the Board to reverse the outcome of an arbitral decision that upheld, as a contractual matter, the discharge of an employee, absent "some evidence that the statutory issue has actually been decided." 643 F.2d at 969.

running the continuous miner machine. That is, Pasula was fired because of unprotected activity. FlorJancic, the mine superintendent, testified that Pasula was discharged for his refusal to perform his assigned duties, interference with management of the mines and creation of an interruption in production. FlorJancic's testimony does not establish that Pasula was admittedly discharged for protected activity, *i. e.* walking off the job. Rather, he was discharged for a combination of reasons, including (1) his refusal to continue operating the continuous miner machine after an independent determination had been made under the Wage Agreement that there was no health or safety hazard, *and* (2) his refusal to let anyone else operate the machine.

It is important to note that Pasula was not disciplined after he refused to work but only *after* he had shut down the machine and refused to permit anyone else to operate it. Appendix at 195a–196a. Furthermore, he was not discharged or disciplined when he complained that the continuous miner machine was making too much noise. Instead, he was immediately given alternative work until a determination regarding the level of noise was made. He was only disciplined after he *exceeded* the scope of his putative right to refuse to work under the statute by refusing to let anyone else operate the continuous miner machine. Pasula was not given an ultimatum. He was not told that he would be fired if he did not accept the foreman's evaluation of the danger. He was given the opportunity of having a safety committeeman evaluate the danger. Also, he had the chance to alternate with Fischer if he was afraid of pro-

longed exposure to the noise. It was only after he rejected all these options (including the option of simply walking off the job by himself) *and* shut down the machine that he was taken out of the mine by Consol.

The argument that Pasula did not in fact prevent others, including Fischer, from operating the machine is, on the record before us, unconvincing. In response to the question of whether he had decided not to run the machine only upon Pasula's declaration that the machine was down, Fischer testified:

A. Well, I figured if he wasn't going to, I wasn't going to. He's the senior operator there. If he wasn't going to do it, I wasn't going to do it.

Q. Did he threaten you, did he tell you not to run it?

A. *He said the machine was down,* he didn't threaten me.

Appendix at 130a–131a (emphasis added).[8]

Furthermore, Pasula acknowledged that other workers were idled against their wishes as a result of his shutting down the machine:

Q: Did any of these crew members that were idled say anything to you?

A. It wasn't more or less what they said, you know, you can tell what they feel. They were pretty upset that they were being sent home again, for the second night in a row, especially on the midnight.

Appendix at 88a. And, at the ALJ hearing, Pasula testified as follows:

Mr. Jenkins: Q. Mr. Pasula, when you said that the mean [*sic*] is down, did you mean it as to everyone in the entire mine that you were shutting the machine

---

8. When asked at the ALJ hearing whether he would have run the machine had Pasula not shut it down, Fischer at first responded "well no."

Q. Why?
A. Because—I don't know, they brought the safety committee in there—I really didn't know what was going on.
Q. You were confused?
A. Yes. I didn't know what was going on. I was confused. But I wasn't going to do somebody else's job.

Appendix at 133a–134a.
However, at the hearing before Arbitrator Beckman, the record shows that in response to the question "If Dave (Pasula) would not have shut down the machine, would you have run it?" Fischer had responded simply "I don't know. I can't answer that. You are asking me something that I can't answer." Appendix at 133a–134a.

down, or did you mean it as to Dave Pasula?

A. At that time, I had told him that it was down—that I had shut it down myself. I had told him before that I shut it down.

Judge Moore: Q. I don't quite follow this. Now, you shut it down; you turned the key off, is that what you mean, or whatever?

A. It just wasn't operating. In other words—

Q. I mean, do you, as the operator of the machine—well, like a pilot grounds a plane and says, nobody can fly it. Does a miner have that authority over a machine?

A. The miner has a right to remove himself from a machine.

Q. Do they have a right to say that machine will not operate until something is done to it?

A. It's almost like a pilot. He'll say its down, can you fix it—

Q. In other words, at least in your mind, you have the authority to say, this machine, something is wrong with it, and it will not mine coal until, something is done?

A. Yes. I won't run it until something—

Q. All right. Okay. I think I understand the witness.

Appendix at 83a–84a. Thus, it seems that Pasula was operating under the mistaken assumption that he had the authority to close down the machine totally. Yet there is no evidence on the record to support such a conclusion. Indeed, Pasula acknowledged that when he told Neal that he was not going to operate the continuous miner machine, Neal asked Fischer if he would run the continuous miner machine and that he (Pasula) did not give Fischer a "chance to say anything" before he interrupted and

said that "nobody is going to operate it." Appendix at 100a–101a. Also, three witnesses testified that they heard Fischer then state, *"Here I am in the middle again."* Appendix at 174a (Bigley), 196a (Neal), and 220a (Humanic) (emphasis added). Furthermore, the record shows that on June 2, Fischer sought out the Mine Superintendent, FlorJancic, to explain what had happened the night before. Fischer told FlorJancic: *"I didn't have a chance to run that miner that night. It wasn't my fault."* [9] Appendix at 238a (emphasis added).

The record fully supports the conclusion that Pasula was not disciplined because he refused to work but rather because he exceeded the scope of his right to walk off the job under the Mine Act. The "real" reason for his dismissal was that he turned off the continuous miner machine. This activity was not protected by the Mine Act. The decision of the Commission is therefore reversed.

SLOVITER, Circuit Judge, dissenting.

I agree with the majority's conclusion that the Arbitrator's decision in this case was not binding on the ALJ or on the Commission. However, I dissent from its action in reversing the decision of the Commission. The basis for my disagreement with my colleagues stems from their approach, illustrated by the last paragraph of the majority opinion, where they state:

The record fully supports the conclusion that Pasula was not disciplined because he refused to work but rather because he exceeded the scope of his right to walk off the job under the Mine Act. The "real" reason for his dismissal was that he turned off the continuous miner machine.

Majority opinion at 1221 (emphasis added). Whatever validity the majority's view might have if we were reviewing a Commission "conclusion" that Pasula was ap-

---

9. It is true that the ALJ in this case found that Fischer refused to operate the machine because of what he called "a longstanding mine custom" that one miner will not operate a machine when another miner has refused to operate that machine. Other than Pasula's brief reference to a "captain of a ship" analogy (meaning that a continuous miner machine was like a ship in that if the main operator refused to operate it

the rest of the "crew" would refuse as well), it is not clear from the record that such a custom exists or that Fischer was in any way mindful of such a custom or was acting in accord with it. The evidence shows that on the day shift on June 1, 1978 the continuous miner machine operator, being fully aware that Pasula had shut down the machine on the night shift, operated it without incident.

propriately discharged because he turned off the continuous miner machine and not because he complained or exercised his right to walk off the job under the Mine Act, that is not the conclusion that the Commission reached. Indeed the Commission made precisely the opposite finding.

The ALJ, who had the best opportunity to determine what actually happened because he heard the testimony of the witnesses first hand and could observe their demeanor, found:

> There is no doubt in my mind that Mr. Pasula was discharged because he was complaining about the noisy machine and demanding that a noise level test be made....
>
> I think management had had enough of Mr. Pasula and his health or safety complaints and decided to get rid of him.

Appendix at 35a. The ALJ considered and expressly rejected the employer's contention that a dispositive factor in Pasula's discharge was Pasula's "refusal to allow anyone else to operate the continuous miner."

On appeal, the Commission noted that the complaint filed by the Secretary of Labor did not allege that Pasula was fired for filing or making a safety complaint (as the ALJ had found) but instead alleged that Pasula was fired for engaging in the allegedly protected activity of refusing to work "in unsafe and unhealthful conditions." Appendix at 59a, 56a. Thus the Commission undertook an inquiry into whether section 105(c)(1) of the 1977 Mine Act protects a miner's refusal to work. After a comprehensive review of the various statutory provisions, the purpose of the Act, and the legislative history, the Commission unanimously decided that,

> The successful enforcement of the 1977 Mine Act is therefore particularly dependent upon the voluntary efforts of miners to notify either MSHA officials or the operator of conditions or practices that require correction. The right to do so would be hollow indeed, however, if before the regular statutory enforcement mechanisms could at least be brought to bear, the condition complained of caused the very injury that the Act was intended to prevent. A holding that miners have some right to refuse work under the 1977 Mine Act therefore appears necessary to fully effectuate the congressional purpose.

Appendix at 60a. I agree with the majority that "the statutory scheme, in conjunction with the legislative history of the 1977 Mine Act, supports a right to refuse to work in the event that the miner possesses a reasonable, good faith belief that specific working conditions or practices threaten his safety or health." Majority opinion at 1217 n.6.

Having decided the Act protects some right to refuse to work, the Commission, without setting forth the parameters of that right, undertook to ascertain whether Pasula's action in this case fell within such protected activity. After considering the record, the Commission concluded that "in this case the miner's refusal to work was protected under the 1977 Mine Act." It explained its conclusions as follows:

> Pasula refused to obey Consol's order to work because he believed the work conditions to be unhealthful. He contacted Consol management officials to obtain corrective action, but this was unavailing. He requested an MSHA inspection. His good faith belief was reasonable, and was directed to a hazard that we consider sufficiently severe whether or not the right to refuse work is limited to hazards of some severity. Pasula was not merely speculating that he might in the future suffer from the effects of loud noise, but he was already so suffering when he stopped the machine. He was not equipped with personal hearing protectors, he had already been or would have shortly been exposed to more noise than permitted by the applicable mine health standard, and he was also operating a machine that requires substantial attention to its operation. In view of his actual suffering, his view that he was exposed to unhealthful and excessive noise levels

was reasonable and was supported by objective, ascertainable evidence.

Appendix at 63a.

The Commission then turned to the final question before it, the reason for Pasula's discharge, and *found* that "Pasula's firing was motivated at least in part by his engaging in a protected activity." Appendix at 66a. In response to the employer's contention that Pasula was fired for refusing "to permit anyone else to operate" the machine, the Commission found that even if it were to assume that Pasula was fired also in part for engaging in that presumably unprotected activity, "There is insufficient evidence to find that Pasula would have been fired for engaging only in the unprotected activity." *Id.* In other words the Commission applied the now-accepted "but for" rule in "mixed motivation cases", *see, e. g., Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666, 671 (1st Cir. 1979), which has been accepted by this court. *NLRB v. General Warehouse Corp.*, 643 F.2d 965, 972 (3d Cir. 1981); *Gould Inc. v. NLRB*, 612 F.2d 728, 734 (3d Cir. 1979), *cert. denied, Moran v. Gould*, 449 U.S. 890, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980); *Edgewood Nursing Center, Inc. v. NLRB*, 581 F.2d 363, 368 (3d Cir. 1978). Applying this rule, the Commission found that even if part of the motivation for the discharge was justifiable, Pasula would not have been discharged if he had not engaged in protected activity. Appendix at 66a, 71a.

I believe that the majority opinion reversing the Commission's judgment contains serious errors of both law and fact. The legal error is its disregard of the appropriate standard of review. The factual error is its disregard of the substantial evidence in the record which amply supports the factual findings of both the ALJ and the Commission that Pasula was discharged for engaging in protected activity.

Section 106 of the 1977 Mine Act provides that "[t]he findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive" on the reviewing courts. 30 U.S.C. § 816(a)(1) (Supp. III 1979).

The Supreme Court has defined "substantial evidence" as "something less than the weight of the evidence," noting that "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). We have frequently held that, "[a] court may not displace an administrative body's 'choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Palmer v. Celebrezze*, 334 F.2d 306, 308 (3d Cir. 1964) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)). *Accord, American Iron & Steel Institute v. OSHA*, 577 F.2d 825, 831 (3d Cir. 1978), *cert. denied*, 448 U.S. 917, 101 S.Ct. 38, 65 L.Ed.2d 1180 (1980); *see* K.C. Davis, *Administrative Law of the Seventies* § 29.00 (1976 & Supp.1980). As Judge Hunter recently observed in a similar context:

> We are limited in our review of National Labor Relations Board decisions. If the Board's findings are supported by substantial evidence on the record, we are obliged to enforce them. We are also bound to respect the Board's conclusions on credibility and conflicting evidence if they take into account all relevant factors and are sufficiently explained....
>
> Although we might make a different decision if we were to decide the case *de novo*, ... we must defer to the Board's decision if it is substantially supported by the record.

*NLRB v. General Warehouse Corp.*, 643 F.2d 965, 971, 972 (3d Cir. 1981) (Hunter, J.) (citations omitted).

In determining whether there was "substantial evidence" to support the administrative decision, a court must determine whether the record contains " 'such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion,' " *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). The majority's misperception of its role in this case is evident. It never seeks to review the evidence in the record which supports the Commission's finding that Pasula was discharged, at least in part, for engaging in protected activity. Instead it has undertaken to review the evidence to see whether there is any which would support findings or factual conclusions contrary to those reached by the Commission and, in doing so, has arrogated to itself the fact-finding function.

Significantly, the majority is itself simply wrong in making its key finding that "Pasula was discharged for engaging in the unprotected activity of *shutting down the continuous miner machine*", majority opinion at 1216 (emphasis added). The parties do not dispute the fact that the continuous mining machine "was noisier than usual" because of the replacement of gears, and that "Pasula operated the machine for about an hour and a half, *but stopped the machine* because the noise gave him an 'extreme headache', made his ears hurt, and made him nervous." Appendix at 56a, 57a. (emphasis added). *After Pasula stopped the machine*, he "told Consol about the noise and physical problems, and requested that a noise level reading be taken by Consol or by federal inspectors before he operated the machine any more." Appendix at 57a. Consol refused to take a noise level reading, refused to call in the federal inspectors, and instead undertook only to follow the procedures established under its collective bargaining agreement for review of an allegedly dangerous condition by both management and union representatives. Consol even refused to let Pasula use a telephone on the premises to telephone the federal inspector.

Consol does not contend that Pasula's action in turning off the continuous miner at the time when he did so was either unjusti-

fied or was the basis of the discharge. Instead, the Consol official who fired Pasula stated that he did so because "the safety committeeman and Consol management personnel had resolved the matter about which Pasula had complained, and that, despite the contractual provision that required Pasula to return to work once it was so resolved, Pasula refused to do so." Appendix at 58a. He also stated that "*in addition to* refusing to work, Pasula *also* 'refused to let anybody else work, too', and that this also was a factor in his decision to fire Pasula." *Id.* (emphasis added). Thus, it is beyond cavil that Pasula's action in stopping the machine, *i. e.* turning it off, was not the basis of his discharge.

I agree with the Commission that Pasula had reasonable grounds to believe he was exposed to unhealthful and excessive noise levels. The operator of the machine immediately before Pasula found the machine to be so noisy that he followed the unusual procedure of turning the machine off rather than idle it to reduce the noise. Pasula tried to get a noise reading, but Consol refused. The committee evaluated the noise in Pasula's absence under unrepresentative conditions, since they concluded the machine was not too loud to operate without hearing the machine running at the face with all motors running. Appendix at 30a. In fact, a subsequent inspection by the federal inspector, after the machine had been idling which reduced the noise of the new gears, found that with the pump motor running alone and with the machine not cutting coal, the noise level was 93 decibels; with the pump motor running, the conveyor running, and the machine mining coal, the level was 103 decibels. Appendix at 31a, 32a. Pasula had not been provided with hearing protectors, and under that condition, the noise standard applicable does not permit miners to be exposed to 90 decibels for more than an eight hour period or to 102 decibels for more than one and one-half hour. 30 C.F.R. § 70.510 (1979). Finally, Pasula requested that he be given alternate work which was refused. Appendix at 31a.

The majority opinion is replete with internal inconsistencies. In the same paragraph where the majority states that the record "supports the conclusion that Pasula was discharged because he kept Fischer from working on the machine and thereby stopped the entire shift", the majority also states that Pasula "was discharged *for a combination of reasons,* including (1) his refusal to continue operating the continuous miner machine after an independent determination had been made under the Wage Agreement that there was no health or safety hazard, *and* (2) his refusal to let anyone else operate the machine." Majority opinion at 1220 (first emphasis added).

The majority, however, fails to consider whether Pasula's action in refusing "to continue operating" the machine [actually resuming operation] fell within an employee's statutory right to refuse to work. Thus although at one point in its opinion the majority appears to accept the view of the Commission that this may be considered as a case involving mixed motivation, the majority focuses only on the alleged "proper" motive and never on the improper motive for discharge.

What is there then in the record upon which the majority relies for its view that Pasula *refused to let anyone else operate* the machine? The record is bare of any evidence that Pasula told Fischer, the only other person who could operate the machine, not to do so. The majority itself refers to the record where Fischer testified that Pasula "didn't threaten me." Although the majority refers to a "directive" by Pasula "that no one was going to run the machine," there is no support for that on the record. The *only* actions or statements of Pasula referred to by the majority are that Pasula "slapped the machine, cursed, and declared [either] 'nobody's going to operate it'", or "the machine [is] down." Majority opinion at 1214 & n.3.

The statement "nobody's going to operate it" is at best equivocal. There is ample evidence in the record to support viewing this as an accurate factual statement, since the ALJ found that "it is a general long-standing mine custom that when one miner will not operate a piece of equipment, another one will not." Appendix at 30a. It is conceivable that, with certain intonation, the statement might be understood as a threat, but the person to whom it would have been intended, Fischer, did not understand it as such, and, significantly, there was no such finding made by the fact finder. The majority, without any justification which I can find on the record, has simply substituted itself as the fact finder.

It is particularly unfortunate that the majority has chosen this case to do so. It appears that this was the first decision of the Commission under the 1977 Mine Act to consider whether a miner may refuse to work in conditions that the miner believes are unsafe or unhealthful. Thus it represented a significant milestone in the Commission's interpretation of the statute. The majority's interpretation eviscerates the very right which it declares. Furthermore, the factual context in which the case arose cannot be ignored. The day before the incident in question, Pasula had found that the methane monitor on the continuous miner was inoperative and refused to operate it until the monitor was repaired. Operation for the period of time requested by the foreman would have been illegal, but instead of repairing the monitor Consol sent Pasula and his crew home. The ALJ found that the crew was entitled to be paid for that entire shift, stating, "[t]he fact that management chose not to [repair the monitor] is a further factor indicating that they were punishing Mr. Pasula and his crew for his refusal to operate the continuous miner illegally for an 8-hour period." Appendix at 34a. That portion of the ALJ order has apparently not been appealed. One may reasonably conclude from the record that Pasula was a vigorous advocate of mine safety. The ALJ and the Commission both concluded he was discharged by the employer for engaging in protected activity. The decision of this court overturning that factual finding will send vibrations to coal operators which may well thwart the congressional intent to pre-

vent unsafe and unhealthful mine conditions and to involve miners actively in the enforcement of the Act.

Although I do not support the majority's reversal of the Commission's order neither could I vote to affirm on the present record. In determining that Pasula had a right to refuse work under the circumstances of this case, the Commission declined to decide the level of seriousness of the safety or health problem which justifies an employee's refusal to work. Instead the Commission held only that Pasula's concern was directed to "a hazard that we consider sufficiently severe whether or not the right to refuse work is limited to hazards of some severity." Appendix at 63a.

I believe that before the Commission can rely on an employee's right to walk off to sustain a reinstatement order, it must first articulate some standard as to the severity of the hazard which triggers that right. While the Commission may be entitled to reject the standard suggested by Consol that the only hazard justifying a walk off is one posing an "abnormal imminent danger," Appendix at 64a, it cannot avoid enunciating some standard so that both mine operators and employees may be guided accordingly. Furthermore, unless the Commission informs the courts as to the standard which it is utilizing, we cannot effectively perform our function of determining whether there is substantial evidence in the record to support the Commission's finding of the right to walk off in a particular situation. Since the Commission is the agency with the primary responsibility for interpreting and enforcing the 1977 Mine Act, I believe it should have the opportunity to articulate and explicate the appropriate standard in the first instance. For that reason, I would vote for a remand to the Commission.