**CONSOLIDATION COAL COMPANY, Petitioner,**

v.

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION and Secretary of Labor, Mine Safety and Health Administration (MSHA) on Behalf of Phillip Cameron, Respondents.**

No. 85-2369.

United States Court of Appeals, Fourth Circuit.

Argued May 7, 1986.

Decided July 8, 1986.

Robert M. Vukas, Consolidation Coal Co. (Ronald S. Cusano, Corcoran, Hardesty, Whythe & Polito, P.C., Pittsburgh, Pa., on brief) for petitioner.

Ann Rosenthal, Appellate Litigation, U.S. Dept. of Labor, Arlington, Va. (George R. Salem, Deputy Sol. of Labor, Cynthia L. Attwood, Associate Sol., Barry F. Wisor, Washington, D.C., on brief) for respondents.

Before SPROUSE and ERVIN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

SPROUSE, Circuit Judge:

Consolidation Coal Company appeals from the Federal Mine Safety and Health Review Commission's final order upholding an Administrative Law Judge's decision that Consolidation improperly suspended Phillip Cameron in retaliation for refusing to perform his job because of a safety concern. We affirm.

## I.

Cameron was a haulage motorman with considerable experience. He normally operated a twenty-seven-ton locomotive which pulled a "trip" of ten to twelve loaded coal cars from where the coal was mined to the main dumping point. He then returned to his working section of the mine with an empty trip. A less experienced miner, Elmer Aston, was Cameron's motorman helper.

During this haulage, coal cars sometimes come uncoupled from the locomotive, creating a "runaway" trip. Dealing with runaways, therefore, was a major safety concern in the work assigned to Cameron and Aston. In the event of a runaway, it had been Aston's job to throw safety switches which derailed the uncoupled cars. After union safety committees questioned this practice, Consolidation agreed to change the procedure to require Aston to operate a ten-ton "trailing" motor at the rear of each trip to serve as a brake in the event of a runaway. Both Cameron and Aston questioned whether the ten-ton motor had sufficient power to stop a runaway trip of loaded coal cars.

On Saturday, October 31, 1981, the first day the new procedure was scheduled to be used, a fifty-ton motor was not in use, so Cameron operated it as the lead motor and Aston used the twenty-seven-ton locomotive as the trailing motor. The section foreman informed the men, however, that they would have to use the ten-ton motor as the trailing motor in the future. Before reporting for work the following Monday, Cameron discussed his safety concerns with a union safety official and with a member of the mine safety committee, both of whom advised Cameron to call in the safety committee if he was again asked to use the ten-ton locomotive as the trailing motor.

On Monday, November 2, Cameron and Aston were told to use the ten-ton trailing motor. Both men refused to do so and requested a safety committee evaluation of the new procedure, although only Aston could have been endangered by the use of the ten-ton motor in the event of a runaway. A controlled test of the braking power of the ten-ton motor was then conducted at the direction of a Consolidation supervisor, and the motor was able to brake the trip. Although Cameron, Aston, and the

safety committee were dissatisfied with the manner in which the test was carried out, Cameron and Aston finished their shift, performing their assigned work using the ten-ton motor. A second controlled test was conducted on Thursday in the presence of federal and state mine safety inspectors. Once again, the ten-ton motor stopped the uncoupled cars. The results of the test satisfied the inspectors of the safety of the procedure, but Cameron, Aston, and the safety committee remained unconvinced that the test had duplicated actual runaway conditions. Nevertheless, the two miners returned to their assigned work.

On Friday, November 6, Cameron was given a five day suspension without pay for failing to exercise his contractual safety rights in good faith when he refused to perform his assigned task on Monday, November 2. Aston was not disciplined.

Cameron filed a complaint with the Secretary of Labor, alleging that his suspension violated the antidiscrimination provision of the Federal Mine Safety and Health Act of 1977. 30 U.S.C. § 815(c) (1982). On December 13, 1982, the Administrative Law Judge (ALJ) found that Cameron's work refusal was based on a reasonable, good faith belief that Aston would be endangered by the use of the ten-ton trailing motor. Nevertheless, the ALJ dismissed Cameron's complaint, holding that section 815(c) did not protect a miner who refuses to work because of a safety hazard which endangers someone else.

The ALJ's decision was reversed by the Federal Mine Safety and Health Review Commission. 7 FMSHRC 319 (1985). The Commission held that section 815(c) does protect a miner who refuses to perform an assigned task because of a reasonable, good faith belief that to do so will endanger another miner. The Commission's decision required that there be a "direct nexus" between the performance of the work refused and the feared resulting injury to another miner. On remand, the ALJ again found that Cameron had refused to work because he had a reasonable, good faith belief that the new procedure was hazardous. The ALJ also found that the work refused by Cameron had the required di-

rect nexus to the potential hazard to Aston. Therefore, the ALJ found that Consolidation's suspension of Cameron had violated section 815(c). The ALJ's second opinion became the final order of the Commission after the Commission denied discretionary review, and Consolidation filed this appeal.

## II.

Section 815(c) states, in pertinent part:

No person shall discharge or in any manner discriminate against or cause to be discharged or cause discrimination against or otherwise interfere with the exercise of the statutory rights of a miner, representative of miners or applicant for employment in any coal or other mine subject to this chapter ... because of the exercise by such miner, representative of miners or applicant for employment *on behalf of himself or others* of any statutory right afforded by this chapter.

30 U.S.C. § 815(c)(1) (emphasis added). It is generally accepted that this provision grants an individual miner the right to refuse to perform work which he reasonably and in good faith believes threatens his health or safety. Consolidation makes a token argument that the Act does not afford a "statutory right" to refuse work because such a right is not specifically listed in the text of the Act. Case law, however, is uniformly to the contrary. *Miller v. Federal Mine Safety and Health Review Commission,* 687 F.2d 194 (7th Cir.1982); *Consolidation Coal Co. v. Marshall,* 663 F.2d 1211 (3d Cir.1981); *Dunmire and Estle v. Northern Coal Co.,* 4 FMSHRC 126 (1982); *see also Brock v. Metric Constructors, Inc.,* 766 F.2d 469 (11th Cir.1985). These decisions are based in large part on the legislative history of the Act, in which Congress made it clear that it intended to create such a right. *Miller,* 687 F.2d at 195; *Robinette v. United Castle Coal Co.,* 3 FMSHRC 803, 809 (1981); *Pasula v. Consolidation Coal Co.,* 2 FMSHRC 2786, 2790–93 (1980), *rev'd on other grounds sub nom. Consolidation Coal Co. v. Marshall,* 663 F.2d 1211 (3rd Cir.1981). S.Rep. No. 181, 95th Cong., 1st Sess. 35–36, *reprinted in* 1977 U.S.Code Cong. & Ad.News 3401, 3435–36 [hereinafter cited as S.Rep.].

Consolidation's central contention on appeal is that a miner is not protected from discipline for refusal to work under section 815(c) when the miner is not himself endangered, but believes that his continued work performance would threaten a co-worker's safety. We cannot agree. The Commission rejected Consolidation's argument, declaring:

> We have reexamined the same legislative history and statements of Congressional concern requiring recognition of the [right to refuse work that threatens a miner's personal safety] and we can find no persuasive rationale for foreclosing the logical corollary at issue here. Certainly, given the force of Congressional concern for protecting the safety of miners expressed in the Mine Act, which concern led to the granting of a right to refuse unsafe work in the first place, it would be anomalous to hold that in exercising that right a miner could consider only a threat to his well-being without regard to whether that threat or another threat jeopardizes the safety or health of other miners.

7 FMSHRC at 323. The Senate Committee's report recommending passage of the 1977 amendments makes it clear that "the scope of the protected activities [is to be] broadly interpreted ... to include ... the refusal to work in conditions which are believed to be unsafe or unhealthful." S.Rep. at 35, 1977 U.S.Code Cong. & Admin.News p. 3435. Section 815(c) itself speaks of exercising protected rights "on behalf of others." In discussing the antidiscrimination provision during floor debate, Senator Williams spoke of the Act's goal of achieving "a safe and healthful workplace for all miners," and Senator Javits replied that this provision would allow workers to "act as responsible human beings." Legislative History of the Federal Mine Safety and Health Act of 1977, at 1089. Indeed, earlier cases recognized that

miners work in teams and feel responsibility for others in a hazardous situation. *Miller*, 687 F.2d at 196; *see also Metric Constructors*, 766 F.2d 469.[1]

Although we find no cases decided on this precise issue, we agree with the Commission that a miner's right to refuse work under section 815(c) extends to the situation in which his performance of the assigned work would create a danger to others. Requiring a "direct nexus" between performance of the refused assignment and the feared resulting injury avoids protecting so-called "sympathy" work stoppages.

Consolidation next argues that the "reasonable and good faith belief" is the wrong standard for judging a miner's refusal to work when another miner is endangered. It contends that the miner's action should be judged by a yet to be developed "objective" standard. The Commission has consistently held that, in deciding whether or not a miner has properly refused to work for safety reasons, his conduct should be judged on whether he acted in good faith and on a reasonable belief that a hazard exists. *Dunmire and Estle v. Northern Coal Co.*, 4 FMSHRC 126; *Robinette*, 3 FMSHRC 803. In the instant case, the Commission stated:

> We believe that the general analytical framework that has been established for evaluating the legitimacy of an individual miner's refusal to work under circumstances claimed to pose a danger to himself, when carefully applied, effectively can be used in examining a work refusal based on an asserted hazard to another miner. Therefore, we hold that a miner who refuses to perform an assigned task because he believes that to do so will endanger another miner is protected under [section 815(c)] of the Mine Act, if, under all the circumstances, his belief concerning the danger posed to the other miner is reasonable and held in good faith.

*Phillips v. Interior Bd. of Mine Oper. Appeals*, 500 F.2d 772 (D.C.Cir.1974); *see also Cooley v. Ottawa Silica Co.*, 6 FMSHRC 516 (1984), *aff'd sub nom. Ottawa Silica Co. v. Secretary of Labor*, 780 F.2d 1022 (6th Cir.1985) (table).

---

**1.** Also persuasive in this context is the recognition by the Commission and the courts that a work refusal may be protected because it is sometimes the only effective way in which a miner may register a safety complaint. *See*

7 FMSHRC at 324. We perceive no reason why the same standard should not be used in testing the propriety of a miner's refusal to work because another miner might be endangered.

The ALJ made a factual determination that Cameron's conduct was both reasonable and in good faith, and the Commission adopted the ALJ's findings. Since we conclude that the factual issue was decided under the appropriate legal standard, our review is limited. We must affirm if there is substantial evidence in the record to support the findings of fact. 30 U.S.C. § 816(a)(1); *see also Chacon v. Phelps Dodge Corp.*, 709 F.2d 86 (D.C.Cir.1983). Viewing the record as a whole, we believe that there is substantial evidence to support a finding of a violation of section 815(c).

We have reviewed Consolidation's other contentions and, finding them to be without merit, we affirm the decision of the Commission.

AFFIRMED.