920 F.2d 738
 1991 O.S.H.D. (CCH) P 29,178
 JIM WALTER RESOURCES, INC., Petitioner,
v.
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION and the
Secretary of Labor, on Behalf of Michael L. Price
and Joe John Vacha, and, Respondents,
United Mine Workers of America, Intervenor.
 No. 87-7484.
 United States Court of Appeals,
Eleventh Circuit.
 Dec. 21, 1990.
 
 James P. Alexander, Robert K. Spotswood, John W. Hargrove, Bradley, Arant, Rose & White, Birmingham, Ala., for petitioner.
 
 
 1
 L. Joseph Ferrara, Federal Mine Safety & Health Review Com'n, Washington, D.C., for Federal Mine Safety, etc.
 
 
 2
 Barry F. Wisor, U.S. Dept. of Labor, Office of the Solicitor, Arlington, Va., for William E. Brock, etc.
 
 
 3
 Robert H. Stropp, Jr., Patrick K. Nakamura, Stropp & Nakamura, Birmingham, Ala., for United Mine Workers, et al.
 
 
 4
 Edward D. Sieger, Mary-Helen Mautner, U.S. Dept. of Labor, Washington, D.C., for Secretary of Labor.
 
 
 5
 Petition for Review of an Order of the Federal Mine Safety and Health Review Commission (Alabama case).
 
 
 6
 Before KRAVITCH and CLARK, Circuit Judges.*
 
 PER CURIAM:
 
 7
 Section 105(c) of the Federal Mine Safety and Health Act of 1977 ("Act"), 30 U.S.C. Sec. 815(c) (1988), prohibits operators of mines from discharging or otherwise discriminating against an employee who has filed a complaint alleging safety or health violations at a mining facility. If a miner believes that he has been discharged in violation of this section, he may file a complaint with the Secretary of Labor ("Secretary"), who is required to initiate a prompt investigation of the alleged violation. Id. Sec. 815(c)(2). If the Secretary finds that the miner's complaint was "not frivolously brought," she must apply to the Federal Mine Safety and Health Review Commission ("Commission") for an order temporarily reinstating the miner to his job, pending a final order on the complaint. Id. The Commission is required to grant such an order if it finds that the statutory standard has been met. Id.
 
 
 8
 Although the Act does not require a hearing on the Secretary's application for temporary reinstatement, the Commission's regulations provide an opportunity for a hearing upon request of a mine operator, prior to the entry of a reinstatement order. See 29 C.F.R. Sec. 2700.44(b) (1990). The scope of such a hearing "is limited to a determination by [an Administrative Law Judge] as to whether the miner's complaint is frivolously brought," with the Secretary bearing the burden of proof on this standard. Id. Sec. 2700.44(c). Review of this determination may be sought in the Commission. Id. Sec. 2700.44(e).
 
 
 9
 If, upon investigation of a miner's complaint, the Secretary also determines that section 105(c) has been violated, she shall immediately file a complaint with the Commission. 30 U.S.C. Sec. 815(c)(2). After affording an opportunity for a hearing, the Commission shall issue a final order granting appropriate relief, including final reinstatement of the worker. Id. Judicial review of such a final order may be sought in the appropriate Court of Appeals. 30 U.S.C. Sec. 816(a) (1988). However, if temporary reinstatement has already been ordered and the Secretary does not file a discrimination complaint within 90 days or determines that section 105(c) has not been violated, the ALJ may dissolve the temporary reinstatement order. 29 C.F.R. Sec. 2700.44(f).
 
 
 10
 In this case, two miners were discharged by Petitioner Jim Walter Resources, Inc. ("JWR") for allegedly failing to comply with its mandatory drug testing program. The Commission, however, temporarily reinstated these miners on the grounds that they had been discharged in violation of section 105(c) for their active role in reporting health and safety problems at the mine. Because we find that there was substantial evidence to support the Commission's conclusion that the miners' complaints were "not frivolously brought," the order temporarily reinstating the miners is AFFIRMED.
 
 I. BACKGROUND
 A. Facts
 
 11
 Due to an ongoing substance abuse problem among its work force, JWR implemented a mandatory drug testing program for both management and hourly employees effective January 1, 1987. Under the program, any employee may be tested if he is reasonably suspected of substance abuse. In addition, any employee whose duties, whether by job title or elected office, involved safety was also subject to random testing up to four times a year. Management employees subject to such random testing include safety inspectors, associate safety inspectors, section foremen, maintenance foremen, washer foremen, and industrial relations supervisors. The only hourly employees subject to random testing are safety committeemen.
 
 
 12
 Miners Michael L. Price and Joe John Vacha spent a large portion of the workday serving as safety committeemen. Safety committeemen are elected by the miners and have wide-ranging responsibilities for insuring mine safety, including inspection and notification duties under federal mine safety laws, handling of all safety grievances under the collective bargaining agreement, and the reporting of all mine hazards to management. The record indicates that Price and Vacha had garnered reputations for being exceptionally active in their elected duties and that each had brought a large number of safety complaints and grievances during their tenure as safety committeemen. JWR attempted unsuccessfully to fire Price for his safety-related activities in mid-1986 and had disciplined him twice for his safety activities in 1983 and early 1986. In addition, Vacha testified that he had been removed from his job as a continuous mine operator and placed in an office position because he refused to operate his continuous mining machine in the presence of methane.
 
 
 13
 The ALJ found that Price and Vacha had been subjected to crass humor and harassment by management personnel in connection with the testing program both before and shortly after its inception. Before JWR's drug testing program went into effect, Price had notified two management supervisors, Andrews and Hendricks, in November 1986 that he had trouble urinating in the presence of other people and was ridiculed for this problem by Hendricks. In late 1986, Andrews jokingly displayed to Price and Vacha a urine specimen bottle with the notation "Mike Price UMWA". Another JWR management official, Donnelly, reportedly told Price and Vacha that the drug testing program could be used to get rid of them. As Price was filling out papers after a safety inspection, a management official placed a styrofoam cup labeled "Mike Price, safety committeeman, practice cup" in front of Price and Vacha. In February 1987, while Price and Vacha were conducting a union safety inspection, Andrews reportedly picked up an empty canister and told them that this was their "practice cup" and that they should "practice up."JWR directed that all management safety personnel and union safety committeemen at each of its mines should be tested on March 2, 1987. Price and Vacha were notified on the morning of that date that they would be required to provide urine samples after their shift concluded. After reporting to the mine office around 3:30 p.m., both Price and Vacha unsuccessfully attempted to provide urine samples over the next four hours, despite the consumption of water, coffee, and soft drinks. At each attempt, a management supervisor accompanied Price and Vacha into a small restroom for the purpose of observing the specimen production. Vacha, who had taken medication that morning for a nervous stomach and diarrhea, told his supervisors that he had difficulty urinating in a bottle.
 
 
 14
 At 6:45 p.m., Rayford Kelly, the industrial relations supervisor at the mine, warned Price and Vacha that they would be suspended with intent to discharge if they failed to furnish a specimen within 30 minutes, and Vacha responded that he could not be made to urinate. After this warning, Price offered to go into the bathroom naked if he could urinate alone, but this offer was refused. Price and Vacha's request that they be allowed to return in the morning to provide the sample was also denied. In addition, Vacha testified that Kelly told the miners that they could avoid taking the test only if they resigned from the safety committee. At 7:25 p.m., after a second five-minute ultimatum, Price and Vacha were suspended by Kelly with intent to discharge for insubordination. JWR collected 43 other urine samples without incident on March 2 and 3 from both management and union safety personnel; the only two individuals who failed to furnish samples were Price and Vacha.
 
 
 15
 During the next day on March 3, Price and Vacha submitted to drug screening tests at medical facilities with negative results. Although neither Price nor Vacha was ever suspected of substance abuse, JWR refused to accept these test results or to reinstate them. Price and Vacha filed grievances under the collective bargaining agreement and discrimination complaints with the Secretary.
 
 B. Procedural History
 
 16
 1. Arbitrator's Decision. Prior to the events in the instant action, the Intervenor United Mine Workers of America ("Union") and JWR reached a settlement in arbitration on January 29, 1987 under which JWR was allowed to implement its drug testing program, but the Union reserved the right to file grievances on behalf of individual employees subject to it. As a consequence of this settlement, Price and Vacha's grievances were referred to arbitration. In an award dated April 13, 1987, the arbitrator denied Price and Vacha's grievances and found that JWR had justifiable cause for discharging the two miners for insubordinate conduct. The arbitrator found that the miners had no protected right to refuse to furnish samples and that they should have first complied with the request and then sought recourse for any grievances. The arbitrator also found that the miners were given sufficient time and assistance to produce a urine sample and that there was no evidence to indicate that they were physically or emotionally impaired from doing so. Finally, the arbitrator found that the miners had not been discriminated against and that they had been treated no differently than other employees at the mine where they worked.[1]
 
 
 17
 2. Proceedings in the Commission. Pursuant to section 105(c), the Respondent Secretary investigated the miners' complaints, determined that their allegations of disparate treatment were not frivolously brought, and applied for their temporary reinstatement. Finding that it was not bound by the arbitrator's decision, the ALJ held on July 7, 1987 that the miners' complaints "were not clearly without merit, were not fraudulent or pretextual" and that there was "reasonable cause to believe that [their discharge] was in violation of section 105(c)." The ALJ based these conclusions on its findings that Price and Vacha were unable to furnish the requested specimens, that JWR refused to accommodate these difficulties, and that the miners had been subjected to low-level humor and harassment concerning the program. The ALJ ordered JWR to reinstate Price and Vacha pending final determination of their complaints. The ALJ also rejected JWR's constitutional claim that it was denied due process by application of the "not frivolously brought" standard because the standard is too easily met. The ALJ found that this standard was not significantly different from the "reasonable cause to believe that an employee was discharged in violation of law" standard for temporary reinstatement upheld in Brock v. Roadway Express, Inc., 481 U.S. 252, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987). A majority of the Commission affirmed the ALJ's order.[2]
 
 
 18
 JWR brings this appeal on three grounds. First, JWR alleges that the "not frivolously brought" standard for temporary reinstatement under section 105(c) denies it due process of law. Second, JWR argues that Commission erred in failing to defer to any of the findings of the arbitrator who concluded that the discharges were supported by just cause. Finally, JWR contends that the Commission erred in temporarily reinstating Price and Vacha by failing to find substantial evidence showing a causal relationship between the miner's past protected activities and their discharges.
 
 II. JURISDICTION
 
 19
 At the threshold, we must first determine whether the order of the Commission temporarily reinstating Price and Vacha to their jobs is an appealable final order under section 106 of the Act, 30 U.S.C. Sec. 816(a), which grants jurisdiction to the courts of appeals to review decisions of the Commission. Although JWR and the Secretary both agree that we have jurisdiction to hear this appeal, this does not relieve us of our independent obligation to determine the appealability of this case. See Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. 737, 739-40, 96 S.Ct. 1202, 1204-05, 47 L.Ed.2d 435 (1976); In re King Memorial Hosp., Inc., 767 F.2d 1508, 1509 (11th Cir.1985) (per curiam).
 
 
 20
 Section 106(a)(1) allows "any person adversely affected or aggrieved by an order of the Commission" to seek review in the court of appeals for the circuit in which the violation is alleged to have occurred. 30 U.S.C. Sec. 816(a)(1). Although the statute uses the term "order" rather than "final order," this omission alone is insufficient to overcome the general presumption that judicial review of administrative actions is available only when such decisions have become final. See Bell v. New Jersey, 461 U.S. 773, 778-79, [103 S.Ct. 2187, 2190-92, 76 L.Ed.2d 312] (1983). Indeed, the legislative history of this section clearly indicates that Congress intended general principles of finality to apply to appeals brought under section 106(a)(1). See S.Rep. No. 95-181, 95th Cong., 1st Sess. 13 (1977); id. at 40 ("the bill provides procedures for review or enforcement of final orders of the Commission"); House Conf.Rep. No. 95-655, 95th Cong., 1st Sess. 53-54 (1977). Our conclusion that decisions of the Commission must be final in order to be appealable is consistent with the views of other circuits that have addressed this question. See Monterey Coal Co. v. Federal Mine Safety & Health Review Comm'n, 635 F.2d 291, 292-93 & n. 1 (4th Cir.1980) (citing cases); Scotia Coal Co. v. Federal Mine Safety & Health Review Comm'n, 663 F.2d 1073 (6th Cir.1981).
 
 
 21
 Because the Commission's order temporarily reinstating the miners to their jobs does not literally "end[ ] the litigation on the merits and leave[ ] nothing for the court to do but execute the judgment," Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945), there is a close issue of whether this order is a final one for purposes of appellate review. In some respects, an order of temporary reinstatement under section 105(c) is the functional equivalent to a grant of a preliminary injunction by a district court because temporary reinstatement preserves the status quo ante, pending the initiation of more formal proceedings in which the ultimate merits of a miner's complaint are resolved. Thus, the policies that underlie the provision for review of district court orders affecting preliminary injunctive relief in 28 U.S.C. Sec. 1292(a)(1) are applicable here and suggest that temporary reinstatement orders should be reviewable. See 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice & Procedure Sec. 3942, at 316-17 (1977). In light of our obligation to interpret the requirement of administrative finality both pragmatically and flexibly, see Bell, 461 U.S. at 779-80, 103 S.Ct. at 2191-92, however, we need not directly resolve this point because we find that the Commission's order is appealable under section 106(a) on the grounds that it falls directly within the collateral order exception to finality principles. See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 545-47, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949).
 
 
 22
 In order to come within that narrow exception, an interlocutory order must (1) conclusively determine a disputed question; (2) resolve an important issue completely separate from the merits of the action; and (3) be effectively unreviewable on appeal from a final judgment. See Coopers & Lybrand v. Livesay, 437 U.S. 463, 468-69, 98 S.Ct. 2454, 2457-58, 57 L.Ed.2d 351 (1978).
 
 
 23
 All three requirements have been met in this case. First, the Commission's order conclusively determined that JWR must temporarily reinstate Price and Vacha and, as a consequence, rejected JWR's claim that the "not frivolously brought" standard violated due process. The temporary reinstatement of the miners is a "fully consummated" decision, and there are literally "no further steps" that JWR can take in order to avoid the Commission's order at the agency level. Mitchell v. Forsyth, 472 U.S. 511, 527, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985) (citation omitted). Second, the issues raised by JWR's appeal are conceptually different from those implicated by the underlying merits of the miners' claims. The temporary reinstatement hearing merely determined whether the evidence mustered by the miners to date established that their complaints are nonfrivolous, not whether there is sufficient evidence of discrimination to justify permanent reinstatement. Although a review of that order would necessarily entail some consideration of the factual allegations of the miners' complaints, this does not deprive us of jurisdiction if such examination is conceptually distinct from a decision on the ultimate merits. See id. at 527-29, 105 S.Ct. at 2816-17. In addition, JWR's constitutional objections to the statutory standard for temporary reinstatement are completely separable from the true litigation because they can be adjudicated without reference to the substantive merits of the miners' discrimination complaints. See Cohen, 337 U.S. at 546-47, 69 S.Ct. at 1225-26; cf. Mitchell, 472 U.S. at 528-29, 105 S.Ct. at 2816-17.[3] Finally, JWR's claimsin order to be reviewable at all--must be reviewed before the litigation on the underlying merits of the miners' complaints is terminated. Here, the claimed injury from the "not frivolously brought" standard and the infringement on JWR's right to discharge an employee for just cause flow from the Commission's action prior to a decision on the ultimate merits of the miners' complaints. Although these alleged harms from the temporary reinstatement proceeding evaporate once a final decision has been reached, an appeal from the merits would not need to reach these issues, and JWR would effectively lose any opportunity for a judicial hearing of its claims. In such circumstances, JWR is entitled to appeal from the Commission's decision as a collateral order.[4]
 
 III. DISCUSSION
 A.
 
 24
 JWR contends that the "not frivolously brought" standard used by the Commission in temporary reinstatement proceedings under section 105(c)(2) is so lax and easily met by a complaining miner that it deprives JWR of due process of law under the Fifth Amendment. We find, however, that this statutory standard--considered in light of the panoply of procedural protections provided to a mine operator by the Act and the Commission's regulations--is more than sufficient to meet the minimum requirements of due process.
 
 
 25
 With a few exceptions, this case is virtually indistinguishable from the Supreme Court's decision in Roadway Express. There, a truck driver, who had been fired by his employer, filed a complaint with the Secretary alleging that he had been discharged in retaliation for having complained of safety violations in breach of section 405 of the Surface Transportation Assistance Act of 1982, 49 U.S.C.App. Sec. 2305 (1988). Under that statute, the Secretary is required to conduct an investigation of the complaint and, upon her own finding that there is "reasonable cause to believe that a violation has occurred," must issue a preliminary order directing the employer to reinstate the worker. Id. Sec. 2305(c)(2). Only after this reinstatement may an employer then request an evidentiary hearing and a final order from the Secretary; this request, however, does not stay the preliminary order of reinstatement. Id. The truck driver was temporarily reinstated by the Secretary, and the employer brought suit contending that section 405 violated due process by allowing the Secretary to reinstate the employee without first conducting a hearing. 481 U.S. at 256-57, 107 S.Ct. at 1744-45. Applying traditional due process principles,[5] a plurality of the Court held that the procedural protections afforded by section 405 met minimum standards of due process because the employer, prior to reinstatement, was provided with:
 
 
 26
 notice of the employee's allegations, notice of the substance of the relevant supporting evidence, an opportunity to submit a written response, and an opportunity to meet with the investigator and present statements from rebuttal witnesses. The presentation of the employer's need not be formal, and cross-examination of the employee's witnesses need not be afforded [prior to temporary reinstatement.][6]
 
 
 27
 Id. at 264, 107 S.Ct. at 1748.
 
 
 28
 Extrapolating those principles to this case, we note initially that all parties to this case concede that JWR has a property interest, arising from its collective bargaining agreement, in the right to discharge an employee for cause which is entitled to due process protections. See id. at 260-61, 107 S.Ct. at 1746-47. In addition, the balance of competing interests in this case is similar to those posed in Roadway Express. The government has a strong interest in ensuring that miners--who are discharged by their employers for performing important "whistle-blowing" functions--are expeditiously reinstated to their jobs.[7] See id. at 262, 107 S.Ct. at 1748. As to the private interests at stake, JWR has a substantial interest in controlling the makeup of its workforce. See id. at 263, 107 S.Ct. at 1748. In addition, Price and Vacha have a corresponding interest in not being discharged in retaliation for complaining about safety and health violations at JWR's mines. See id.
 
 
 29
 Faced with virtually the same balance of competing government and private interests as in this case, the Supreme Court in Roadway Express held that due process does not require that an employer, who is challenging a temporary reinstatement of an employee, be provided with a pre-deprivation hearing. Due process is satisfied "[s]o long as the prereinstatement procedures establish a reliable 'initial check against mistaken decisions,' and complete and expeditious review is available." Id. (citation omitted).
 
 
 30
 Thus, the crucial issue here is whether the procedural protections afforded to JWR under section 105(c)(2) and the Commission's regulations "reliably protect against the risk of erroneous deprivation, even if only temporary, of an employer's right to discharge an employee." Id. at 264, 107 S.Ct. at 1748. The Court in Roadway Express, however, did not address whether the "reasonable cause to believe" standard, viewed in isolation, violated due process; rather it upheld the statutory standard as a single component of a full range of procedural protections provided to an employer. We also believe that the constitutionality of the "not frivolously brought" standard cannot be adjudicated by artificially isolating it from the broader statutory scheme contained in section 105(c)(2). Rather, the full package of procedural protections provided to an employer must be evaluated in toto to determine whether the statute meets minimum requirements of due process.
 
 
 31
 At the outset of this inquiry, we find that the "not frivolously brought" standard is not so low and easily met by a miner seeking temporary reinstatement as to violate due process. Indeed, there is virtually no rational basis for distinguishing between the stringency of this standard and the "reasonable cause to believe" standard that was implicitly upheld in Roadway Express. The legislative history of the Act defines the "not frivolously brought standard" as indicating whether a miner's "complaint appears to have merit"--an interpretation that is strikingly similar to a reasonable cause standard. S.Rep. No. 95-181, supra, at 36. In a similar context involving the propriety of agency action seeking temporary relief,[8] the former fifth circuit construed the "reasonable cause to believe" standard as meaning whether an agency's "theories of law and fact are not insubstantial or frivolous." See Boire v. Pilot Freight Carriers, Inc., 515 F.2d 1185, 1189 (5th Cir.1975) (emphasis added), cert. denied, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976). Finally, the record clearly shows that the ALJ's decision translated this theory into practice; it applied the "not frivolously brought" standard in the temporary reinstatement proceeding as the functional equivalent of the "reasonable cause to believe" standard.[9]
 
 
 32
 Yet, even assuming that there is a difference in the stringency between the two standards, the other procedural protections provided by section 105(c)(2) establish additional safeguards against mistaken reinstatement decisions resulting from the statutory standard of proof. Under the procedures upheld in Roadway Express as setting out minimum standards of due process, the Secretary had sole authority to investigate a worker's complaint, determine for herself whether the "reasonable cause to believe" standard had been met in particular circumstances, and issue an order of reinstatement. In addition, the statute at issue in Roadway Express provided an employer with a prompt post-deprivation hearing on the merits of a discharged worker's complaint. Before a reinstatement is ordered, an employer had the right only to be notified of the complaint and the substance of the supporting evidence, meet with the Secretary's field investigator to respond verbally to the employee's charges, and provide its own written response to the complaint.
 
 
 33
 By contrast in the case before us, section 105(c)(2) of the Act and the corresponding regulations far exceed the minimum requirements in the Surface Transportation Assistance Act by affording an employer the opportunity for a full evidentiary hearing prior to a temporary reinstatement. 29 C.F.R. Sec. 2700.44(b). At this hearing, the employer has the opportunity to test the credibility of any witnesses supporting the miner's complaint through cross-examination and may present his own testimony and documentary evidence contesting the temporary reinstatement. Id. Sec. 2700.44(c). Most importantly, section 105(c)(2) requires that an independent decisionmaker determine whether a miner's complaint in a particular dispute meets the "not frivolously brought" standard. Without suggesting any impugnment of the Secretary's integrity, we believe that an enforcement official--who is charged by law with the duty of vigorously enforcing this country's workplace safety laws--may at times be somewhat favorable to a "whistle-blowing" employee in her determination of whether the employee has been discriminated against. Although this arrangement was approved in Roadway Express, section 105(c)(2) does not limit JWR to such an adjudication from an enforcement official. Rather, the statute grants JWR the right to seek an adjudication from a neutral tribunal, prior to a deprivation of its property interest, with all the regalia of a full evidentiary hearing at its disposal. Thus, the risk of an erroneous deprivation from the standard of proof is substantially lessened by the provision of the panoply of additional procedural guarantees in section 105(c)(2).[10]
 
 
 34
 In this case, the "fundamental requirement of due process" that JWR be given the "opportunity to be heard 'at a meaningful time and in a meaningful manner' " has clearly been met. Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (citation omitted).[11] We therefore conclude that the scheme of procedural protections, including the statutory standard of proof, provided by section 105(c)(2) to an employer in temporary reinstatement proceedings far exceed the minimum requirements of due process as articulated in Roadway Express.[12]
 
 B.
 
 35
 JWR next contends that the ALJ and the Commission abused its discretion in failing to defer or consider the arbitrator's award holding that JWR had discharged Price and Vacha with just cause. We find that the decision of how much weight, if any, an agency should accord to an arbitrator's decision should be left to the discretion of the agency on a case-by-case basis. In this case, we hold that the ALJ and the Commission did not abuse their discretion in declining to defer to the arbitrator's award or his finding of facts.
 
 
 36
 This issue pits the strong judicial policy of deferring to dispute resolution procedures specified in collective bargaining agreements against the imperative of enforcing statutory rights created for employees. Faced with this same tension, the Supreme Court has stated that:
 
 
 37
 [w]hile courts should defer to an arbitral decision where the employee's claim is based on rights arising out of the collective-bargaining agreement, different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers.
 
 
 38
 Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 728, 737, 101 S.Ct. 1437, 1443, 67 L.Ed.2d 641 (1981); accord McDonald v. West Branch, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984); Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). As we have noted on a prior occasion, the question of "[w]hether [arbitration] proceedings [are] adequate to protect an employee's statutory rights--and thus [are] worthy of weight--necessarily ... varies on a case-by-case basis." See Roadway Express, Inc. v. Brock, 830 F.2d 179, 181 (11th Cir.1987).
 
 
 39
 In this case, we find that it would be wholly inappropriate to require the ALJ and the Commission to defer to the arbitrator's decision on matters involving the vindication of the miners' statutory rights under section 105(c). Our review of the record does not dispel the presumption that the " 'specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land,' " Barrentine, 450 U.S. at 743, 101 S.Ct. at 1446 (citation omitted), and, as a consequence, an arbitrator may not possess the same competence in dealing with the public law dimensions inherent in temporary reinstatement proceedings. In addition, the arbitrator here may not have the contractual authority, arising from the collective bargaining agreement, to enforce or even interpret questions of statutory law. See id. at 744-45, 101 S.Ct. at 1446-47. Finally, we recognize that Congress created a unique statutory scheme under section 105(c) to preserve a miner's right not to be discriminated against and that arbitration would serve as a poor substitute for adjudicating claims under this statute.[13] See McDonald, 466 U.S. at 289, 104 S.Ct. at 1802; Alexander, 415 U.S. at 56-57, 94 S.Ct. at 1023-24.
 
 
 40
 Although the Commission need not defer to the arbitrator's award, this does not necessarily preclude the possibility that the arbitral decision might be accorded some weight in the Commission's deliberations. See Barrentine, 450 U.S. at 743 n. 22, 101 S.Ct. at 1446 n. 22. Our review of the record, however, indicates that the ALJ was justified in discounting the findings contained in the arbitrator's award because the statutory and contractual issues before it were not congruent. Consolidation Coal Co. v. Marshall, 663 F.2d 1211, 1218-19 (3d Cir.1981). It is clear that the vast bulk of the arbitral award was directed at the contractual issue of whether JWR discharged Price and Vacha for just cause in violating a work rule; only passing consideration was given to the statutory issue of whether the miners were discriminated against for their safety activities. More importantly, the arbitrator never specifically set out the standard of proof that he used in evaluating the miners' discrimination complaints. If the arbitrator analyzed this question as a final decision on the merits, his award should carry little or no weight in a temporary reinstatement proceeding in which the less stringent "not frivolously brought" standard is applied. The award would have only some possible relevance in a final reinstatement proceeding. But cf. id. at 1217-19. Because the issues and standard of proof in the arbitrator's decision are not congruent to those presented in a temporary reinstatement proceeding, we conclude that the ALJ and the Commission did not abuse its discretion in failing to grant the arbitrator's findings any weight in its deliberations.[14]
 
 C.
 
 41
 Finally, JWR contends that the Commission's temporary reinstatement order is not supported on the record by substantial evidence.[15] Although we are aware that the circumstances surrounding the discharges of Price and Vacha are not the garden-variety discrimination complaint usually brought under section 105(c), our review of the record indicates that there is substantial evidence to support the Commission's order. Although the miners were able to display only scant proof that there was a direct nexus between a particular instance of protected activity and their subsequent discharges, the record is replete with evidence showing that JWR's failure to accommodate Price and Vacha's unsuccessful efforts to produce a urine sample was motivated by a desire to retaliate against them for their safety-related activities. Evaluated against the "not frivolously brought" standard, we conclude that the Secretary has made a sufficient showing of the elements of a complaint under section 105(c). See Eastern Associated Coal Corp. v. Federal Mine Safety & Health Review Comm'n, 813 F.2d 639, 642 (4th Cir.1987).
 
 
 42
 There is substantial evidence to show that both Price and Vacha were physically or emotionally unable to furnish a urine specimen on March 2. Prior to the implementation of the JWR's drug testing program, Price had notified JWR's management personnel that he had a long-standing problem of urinating in the presence of other people, and Vacha was taking medication that might have made it more difficult to urinate on demand. In addition, both miners had urinated shortly before the end of their shifts. They also testified that they became increasingly tense and nervous throughout this episode which contributed further to their inability to complete the testing. Their physical discomfort was also exacerbated by the fact that they had just finished a full shift, were caked in coal dust, and were hungry.
 
 
 43
 More importantly, both Price and Vacha never explicitly refused to cooperate with the drug testing program or disobey Kelly's order to provide a specimen. Indeed, each miner attempted on at least five occasions to furnish a specimen and continuously consumed beverages to aid in this cause.[16] Price and Vacha also volunteered alternative means to furnish a specimen--such as stripping naked so that they could go into the bathroom alone or returning the next morning--but were rebuffed by management personnel. In addition, JWR refused to accept the negative results from their drug screening tests performed the next day on their own initiative. Finally, their embarrassing four-hour ordeal was ended not by the miners, but when Kelly, after an ultimatum, suspended the miners.
 
 
 44
 The record supports the inference that JWR's failure to accommodate the miners' difficulty in producing a specimen was motivated by a desire to retaliate against them for their safety activities which are protected under section 105(c). Price and Vacha, two of the three safety committeemen at the mine where they worked, had earned reputations for being vigilant in their duties and, as a consequence, had incited some animosity from management. Inference of a retaliatory motive is further supported by management's sophomoric attempts at humor about the drug testing program directed at Price and Vacha that were calculated to harass or at least embarrass them. Indeed, the very personnel who made these crass remarks were the same individuals who administered the tests to the miners. In contrast, the record shows that miners at other JWR facilities, who had difficulty producing urine specimens, were reasonably accommodated by management. In one case, a miner, who was unable to produce a specimen at the beginning of his shift, was allowed to return nearly seven hours later at the end of the shift to complete his testing. In another case, a miner, tested for cause due to involvement in an accident, was allowed the opportunity to go home and return the next morning to furnish a specimen. Although JWR claims that it had no standing policy to deal with workers unable to furnish specimens, these examples of disparate treatment reasonably suggest that not only was their handling of Price and Vacha's testing clumsy and inconsiderate, but was also infected by a retaliatory motive.[17]
 
 
 45
 In light of the accepted view that section 105(c) should be interpreted broadly to protect the health and safety of miners, see Brock ex rel. Parker v. Metric Constructors, 766 F.2d 469, 472 (11th Cir.1985), we find that there is substantial evidence on this record to support the Commission's conclusion that the miners' complaints were not frivolously brought. We therefore AFFIRM the Commission's order temporarily reinstating Price and Vacha.
 
 
 
 *
 Judge Philip Nichols was a member of the panel which heard oral argument but due to his death did not participate in this decision. This case is decided by a quorum. See 28 U.S.C. Sec. 46(d)
 
 
 [1]
 The Union subsequently filed suit seeking to set aside the January 29 award, the April 13 award denying the miners' grievances, and two subsequent arbitration awards involving JWR's drug testing program. The district court granted summary judgment in favor of JWR, finding that the January 29 award barred any further facial attacks on the program and that the subsequent awards were not arbitrary, capricious, or irrational. There was no appeal from this grant of summary judgment
 
 
 [2]
 Although not relevant for our purposes, we note that the Secretary, during the pendency of this appeal, filed a complaint under section 105(c)(2) with the Commission seeking final reinstatement of Price and Vacha. On July 13, 1988, the ALJ ordered the permanent reinstatement of the miners on the grounds that JWR's drug testing program facially violated section 105(c) because the only hourly employees subject to random testing were safety committeemen. He also found, however, that the program was not discriminatorily applied to the miners. On review, the Commission on August 20, 1990 reversed the ALJ's determinations that the program was facially invalid and that the program had not been discriminatorily administered to Price and Vacha. The case has now been remanded to the ALJ for further consideration of whether the drug testing program was applied discriminatorily. Because no final determination of the ultimate merits of Price and Vacha's complaints has yet been reached, the temporary reinstatement order continues to affect the parties' rights and interests in this case
 
 
 [3]
 An oft-overlooked requirement of the collateral order exception is that the interlocutory order must present a "serious and unsettled question." Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 547, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949); accord Nixon v. Fitzgerald, 457 U.S. 731, 741-43, 102 S.Ct. 2690, 2696-98, 73 L.Ed.2d 349 (1982). JWR's constitutional claim that the "not frivolously brought" standard under section 105(c)(2) deprives it of due process presents an issue of first impression and therefore meets this standard. Because JWR's additional claim that the Commission's order is unsupported by substantial evidence is an adjunct to its constitutional claim, we may reach that issue as a matter of judicial economy and convenience. However, we express no opinion on whether appeals from the grant or a denial of a temporary reinstatement, standing alone, present a sufficiently "serious and unsettled question" to merit review under the collateral order exception. Cf. Donlon Indus., Inc. v. Forte, 402 F.2d 935, 937 (2d Cir.1968) (Friendly, J.) (holding that questions of whether a court has power to require an undertaking are appealable as collateral orders, but that exercises of a trial court's discretion are too negligible to be appealable)
 
 
 [4]
 We note that the Supreme Court in Roadway Express was faced with roughly the same procedural posture of reviewing the constitutionality of procedures used to temporarily reinstate an employee. See Brock v. Roadway Express, Inc., 481 U.S. 252, 255-57, 107 S.Ct. 1740, 1744-45, 95 L.Ed.2d 239 (1987). Although the employee's final reinstatement proceeding was already completed at the time review was sought, the Court found it still had jurisdiction to hear the appeal arising from the preliminary reinstatement order. Id. at 257-58, 107 S.Ct. at 1745-46. Here, we see no reason why JWR's appeal from the Commission's order should be delayed until the final reinstatement proceedings are completed. The issues arising from the two types of proceedings are conceptually distinct, and our review of the temporary reinstatements would not be aided in any way by awaiting the ultimate outcome of the miner's complaints
 
 
 [5]
 The Court has consistently held that due process is not a static concept, but rather "is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). As a consequence, the exact quantum of process that is due under particular circumstances depends on a balancing of three factors: (1) the private interests that are affected by governmental action; (2) the risk of an erroneous deprivation of such interest through the provided procedures and the probable value of additional safeguards; and (3) the government's interest, including the burdens that would be created by additional process. Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 902-03, 47 L.Ed.2d 18 (1976). In determining whether a particular standard of proof in a proceeding satisfies due process, a court is required to engage in a balancing of these three factors. See Santosky v. Kramer, 455 U.S. 745, 754, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599 (1982)
 
 
 [6]
 The Court held, however, that the employer had been denied due process in this case because the government had failed to notify it of the substance of the truck driver's complaint. See Roadway Express, 481 U.S. at 265, 107 S.Ct. at 1749
 
 
 [7]
 Congress, in enacting section 105(c) of the Act, specifically noted that:
 [i]f our national mine safety and health program is to be truly effective, miners will have to play an active part in the enforcement of the Act. The Committee is cognizant that if miners are to be encouraged to be active in matters of safety and health, they must be protected against any possible discrimination which they might suffer as a result of their participation. The Committee is also aware that mining often takes place in remote sections of the country, and in places where work in the mines offers the only real employment opportunity.
 S.Rep. No. 95-181, supra, at 35.
 
 
 [8]
 In Boire, the fifth circuit was adjudicating whether the National Labor Relations Board had reasonable cause to believe that an employer had engaged in unfair labor practices in seeking temporary relief under section 10(j) of the Taft-Hartley Act, 29 U.S.C. Sec. 160(j) (1988). See Boire v. Pilot Freight Carriers, Inc., 515 F.2d 1185, 188-89 (5th Cir.1975), cert. denied, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976)
 
 
 [9]
 For instance, the ALJ specifically noted that "[t]he 'not frivolous' test is similar to the test of 'probable cause' in federal civil practice or 'reasonable cause to believe' under other statutes." Later, in explaining his decision, the ALJ concluded that:
 the evidence establishes that the complaints were not clearly without merit, were not fraudulent or pretextual. I further conclude that the evidence establishes a reasonable cause to believe that the discharge of Price and Vacha was in violation of section 105(c).
 Although the Commission did not specifically equate these two standards, a dissenting Commissioner noted that the ALJ "correctly in my view, has cast the frivolousness test in terms of whether there is 'reasonable cause to believe.' "
 
 
 [10]
 Because of our prior conclusion that the "not frivolously brought" standard is the functional equivalent to the "reasonable cause to believe" standard implicitly upheld in Roadway Express, we find it unnecessary to consider further whether the probable value of a stricter standard of proof in reducing the risk of erroneous deprivations outweighs the additional fiscal or administrative burdens that would be imposed. See Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)
 
 
 [11]
 Even assuming that the "not frivolously brought" is a less stringent standard, we find that it accurately reflects a "societal judgment about how risk of error should be distributed between [mine operators and mine employees]." Santosky, 455 U.S. at 755, 102 S.Ct. at 1395; see also Addington v. Texas, 441 U.S. 418, 423-25, 99 S.Ct. 1804, 1807-09, 60 L.Ed.2d 323 (1979). In placing an antidiscrimination provision in the Act, Congress clearly expressed its intent that individual miners would be an integral part of this nation's attempt to ensure the safety of mining facilities and that they should be protected from unjust discharges in such activities. See Brock ex rel. Parker v. Metric Constructors, Inc., 766 F.2d 469, 472 (11th Cir.1985). In furtherance of this expressed policy, Congress, in enacting the "not frivolously brought" standard, clearly intended that employers should bear a proportionately greater burden of the risk of an erroneous decision in a temporary reinstatement proceeding. Any material loss from a mistaken decision to temporarily reinstate a worker is slight; the employer continues to retain the services of the miner pending a final decision on the merits. Also, the erroneous deprivation of an employer's right to control the makeup of his workforce under section 105(c) is only a temporary one that can be rectified by the Secretary's decision not to bring a formal complaint or a decision on the merits in the employer's favor. In light of these considerations, we are unable to accept JWR's contention that the "reasonable cause to believe" standard is better calibrated than the "not frivolously brought" standard in reflecting society's judgment about how the risk of error should be borne as between miners and operators
 
 
 [12]
 The Secretary has made the rather interesting argument that JWR's attack on the constitutionality of section 105(c)(2) is, in reality, a "substantive" due process claim hiding in "procedural" due process clothing. We believe that this misperceives the nature of JWR's claims. JWR is not arguing that Congress is foreclosed from making certain legislative choices--such as requiring the temporary reinstatement of workers who have been discriminated against--by substantive limitations inherent in the concept of due process. Rather, it claims that it has been deprived of due process when those legislative choices have been translated into determinations of individual cases by an overly lax standard of proof. This is a classic procedural due process claim. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538-42, 105 S.Ct. 1487, 1491-93, 84 L.Ed.2d 494 (1985); see, e.g., Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (applying procedural due process analysis in determining constitutionality of standard of proof in parental neglect proceedings). In any case, the question is wholly academic because we uphold section 105(c) against JWR's procedural due process claims
 
 
 [13]
 Under different facts involving a miner's permanent reinstatement proceedings under section 105(c), the third circuit has held that an arbitrator's decision is not binding on the ALJ or the Commission. See Consolidation Coal Co. v. Marshall, 663 F.2d 1211, 1217-19 (3d Cir.1981)
 
 
 [14]
 This court's opinion in Roadway Express is also inapposite. In that case, we held that the ALJ and Secretary abused their discretion in refusing even to admit or examine the arbitrator's decision. Roadway Express, Inc. v. Brock, 830 F.2d 179, 180-81 (11th Cir.1987). In this case, however, the ALJ both admitted the award into evidence and examined it, but chose to discount it because of the lack of congruence between the two proceedings
 
 
 [15]
 We are required to uphold the Commission's findings if we determine that they are supported by substantial evidence. 30 U.S.C. Sec. 816(a)(1). However, because our review of the Commission's order must be evaluated against the "not frivolously brought" standard, this opinion has no bearing on the ultimate merits of the miners' complaints
 
 
 [16]
 Although the record is not explicit on this point, we do not believe that a four-hour delay in providing a specimen--under the conditions experienced by Price and Vacha--is outside the bounds of ordinary human experience
 
 
 [17]
 Indeed, the vagaries of employee drug testing procedures are particularly susceptible to exploitation by an employer bent on retaliation. In this case, the record supports the Commission's finding that JWR used the most invasive element of such tests to discriminate against the miners