# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 15, 2019          Decided May 7, 2019

No. 18-1098

MARSHALL COUNTY COAL COMPANY, ET AL.,
PETITIONERS

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
AND SECRETARY OF LABOR, MINE SAFETY AND HEALTH
ADMINISTRATION,
RESPONDENTS

UNITED MINE WORKERS OF AMERICA INTERNATIONAL UNION,
INTERVENOR

———

On Petition for Review of a Decision of the
Federal Mine Safety and Health Review Commission

———

*Margaret S. Lopez* argued the cause and filed the briefs for petitioners.

*Emily Toler Scott*, Attorney, U.S. Department of Labor, argued the cause for respondents. With her on the brief was *Ali A. Beydoun*, Counsel, Appellate Litigation. *John T. Sullivan*, Attorney, Mine Safety and Health Review Commission, entered an appearance.

*Laura P. Karr* argued the cause and filed the brief for intervenor United Mine Workers of America International Union.

Before: MILLETT and PILLARD, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Section 105(c)(1) of the Federal Mine Safety and Health Amendments Act of 1977 ("Mine Act" or "Act") prohibits mine operators from interfering with miners' exercise of statutory rights. *See* 30 U.S.C. § 815(c)(1). This case involves claims by miners that mine operators interfered with their rights under Section 103(g) of the Act to raise anonymous complaints with the Mine Safety and Health Administration ("MSHA") regarding health and safety issues. *See* 30 U.S.C. § 813(g)(1).

Petitioners are five underground coal mines in West Virginia and associated corporate entities, including the owner and operator of the mines, Murray Energy Corporation ("Murray Energy"). Robert Murray ("Murray") is the President and Chief Executive Officer of Murray Energy. At issue are a series of mandatory "Awareness Meetings" that were held at each of the five mines. During the meetings, Murray criticized miners' use of the Section 103(g) process and instructed miners that, if they filed such complaints, they must make the same reports to mine management.

Several miners and a union representative filed complaints with the Secretary of Labor ("Secretary") alleging that Petitioners had interfered with their rights to file anonymous complaints pursuant to Section 103(g). The Secretary then filed

a complaint on behalf of the miners with the Federal Mine Safety and Health Review Commission ("Commission"). The Commission, in turn, found that Petitioners had violated Section 105(c)(1) of the Act by interfering with miners' Section 103(g) rights. The Commission imposed various remedies, including a penalty of $20,000 per violation and an order requiring Murray to personally hold a meeting at each mine and read a statement regarding the violations. Petitioners then filed a timely petition for review with this court.

Petitioners' primary argument is that the Commission erred in assessing the Section 105(c)(1) claims because it failed to consider whether Petitioners' actions were motivated by an intention to interfere with the miners' protected rights. We decline to decide whether the Commission applied the correct test of interference under Section 105(c)(1) because Petitioners failed to raise and preserve the issue during the administrative proceedings before the Administrative Law Judge ("ALJ") and the Commission. In addition, we find that, even under the legal standard that Petitioners would have us adopt, substantial evidence in the record clearly supports the Commission's finding that Petitioners interfered with miners' Section 103(g) rights. Moreover, we find no merit in Petitioners' challenge to the assessment of monetary penalties. And, finally, we hold that Petitioners failed to properly raise and preserve, and thus forfeited, their claims challenging the order requiring Murray to read a statement.

For the reasons explained below, we deny the petition for review.

## I. BACKGROUND

### A. Statutory Background

"Congress adopted the Mine Act 'to protect the health and safety of the Nation's . . . miners.'" *Wilson v. Fed. Mine Safety & Health Review Comm'n*, 863 F.3d 876, 878 (D.C. Cir. 2017) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 202 (1994)). "To accomplish its goals, the Mine Act charges two separate agencies with complementary policymaking and adjudicative functions." *CalPortland Co. v. Fed. Mine Safety & Health Review Comm'n*, 839 F.3d 1153, 1156 (D.C. Cir. 2016) (citation omitted). The Secretary, acting through MSHA, has "rulemaking, inspection, and enforcement authority," while the Commission is "an adjudicatory body[,] independent of the Secretary," that reviews challenges to MSHA's actions. *Wilson*, 863 F.3d at 879 (citation omitted).

Congress recognized that its national mine safety and health program would be most effective if miners and their representatives contributed to the enforcement of the Mine Act. *Council of S. Mountains, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 751 F.2d 1418, 1420 (D.C. Cir. 1985). To that end, the Act establishes a process for filing complaints with MSHA. *See Meredith v. Fed. Mine Safety & Health Review Comm'n*, 177 F.3d 1042, 1056 (D.C. Cir. 1999) ("Believing miners to be in the best position to detect and report hazards, the Act created a number of mechanisms through which they could notify the MSHA of dangerous conditions, including written complaints, requests for inspection, and the right to point out hazards.").

Under Section 103(g), a miner or a miner's representative who has "reasonable grounds to believe that a violation of this chapter or a mandatory health or safety standard exists, or an

imminent danger exists . . . [has] a right to obtain an immediate inspection by giving notice" of such violation or danger to the Secretary. 30 U.S.C. § 813(g)(1). The Act protects miners who file complaints from having their identities disclosed to mine operators. *See id.* (requiring the Secretary to give the operator a copy or notice of the complaint, but "[t]he name of the person giving such notice and the names of individual miners referred to therein shall not appear in such copy or notification"). Congress considered the "strict confidentiality of complainants" to be "absolutely essential" to protect miners who exercise their right to make Section 103(g) complaints. S. Rep. No. 95-181, at 29 (1977). This is because miners have an interest both in working in a safe environment and in maintaining good relationships with fellow workers and mine management. Absent a guarantee of confidentiality, a miner would be unnecessarily forced to weigh those competing interests in deciding whether to report a violation or dangerous condition to MSHA.

To promote participation in enforcing mine health and safety, the Act specifically protects miners and their representatives against retaliation and interference. Section 105(c)(1) states,

> No person shall discharge or in any manner discriminate against or cause to be discharged or cause discrimination against or otherwise interfere with the exercise of the statutory rights of any miner [or] representative . . . because such miner [or] representative . . . has filed or made a complaint under or related to this chapter, . . . or because of the exercise by such miner [or] representative . . . of any statutory right afforded by this chapter.

30 U.S.C. § 815(c)(1). To make a prima facie case of discrimination under Section 105(c)(1), a miner must prove that he or she was engaged in protected activity and that the adverse action complained of was motivated in some part by that activity. *Leeco, Inc. v. Hays*, 965 F.2d 1081, 1084 (D.C. Cir. 1992); *see also Robinette v. United Castle Coal Co.*, 3 FMSHRC 803, 817 (1981); *Pasula v. Consolidation Coal Co.*, 2 FMSHRC 2786, 2799 (1980), *rev'd on other grounds sub nom. Consolidation Coal Co. v. Marshall*, 663 F.2d 1211 (3d Cir. 1981). Although the standard for discrimination claims is settled, the Commission has yet to reach a consensus on the proper test for interference.

## B. Factual Background

In December 2013, a subsidiary of Murray Energy acquired five underground coal mines in West Virginia: the Marshall County Mine, Marion County Mine, Harrison County Mine, Monongalia County Mine, and the Ohio County Mine. Soon thereafter, MSHA received numerous Section 103(g) complaints from miners alleging safety hazards and violations. From December 2013 through July 2014, MSHA conducted inspections to investigate the complaints, leading to the issuance of 42 citations and orders.

In response to these complaints, Murray sent a letter to the President of the United Mine Workers of America ("UMWA"), whose local unions represent the hourly production and maintenance workers at the mines. In the letter, Murray complained about the "rash of 103(g) complaints" being made by "disgruntled employees" and union officials who were "striking back at the Company for reasons other than safety." Joint Appendix ("J.A.") 589. He described a "very high level of negative findings from MSHA" and claimed that the misuse of the Section 103(g) complaint process was wasting the

agency's and Murray Energy's resources. *Id.* (emphasis in original). After stating that Murray Energy would "never interfere with a miner's right to file 103(g) complaints," Murray requested that management "be given the opportunity to <u>also</u> simultaneously be informed [of] safety issues in place of the 103(g) complaints, or afterwards." J.A. 589–90 (emphasis in original).

Then, between April and July 2014, Murray led a series of "Awareness Meetings" at each of the five mines. The meetings, which were held during each work shift, were mandatory for both management and hourly workers. The meetings consisted of a 77-slide PowerPoint presentation and a speech by Murray. Each PowerPoint presentation opened with the words "MUTUAL TRUST" and explained that the purpose of the meeting was to "<u>communicate</u> the <u>circumstances</u> at [the mine] surrounding your <u>job</u> and your <u>family</u> <u>livelihood</u>," "give you the <u>facts</u>," and "<u>advise</u> you as to what we <u>must</u> do to assure a <u>future</u> for our <u>Mine</u>, <u>jobs</u> and <u>livelihoods</u>." J.A. 482 (emphasis and capitalization in original); *see also* J.A. 502, 520, 538, 556. Many of the underlined terms were displayed in red or yellow. After a few slides emphasizing the importance of miner safety, the presentations said, "Now, Let Us Take a Moment to Think About <u>Your</u> <u>Job</u> Being <u>Suddenly</u> <u>Gone</u>," and asked, "Do You Have <u>Another</u> <u>Job</u> To Go To That Pays the Same <u>Wages</u> <u>and</u> <u>Benefits</u> as the One You Have at [the mine]?" J.A. 485; *see also* J.A. 505, 523, 541, 559. The next slide explained, "There Are <u>No</u> <u>Jobs</u> in This Area That <u>Pay</u> <u>Anywhere</u> <u>Close</u> to What Is Paid at [the mine]. Further, There Are <u>None</u> <u>With</u> <u>the</u> <u>Benefits</u> That You Have." *Id.* (line spacing altered). A subsequent slide reiterated, "Where Will you Move To Find a Job? What Will It Be? There are <u>None</u> Here[.] Certainly None Paying Your <u>Wages</u> and <u>Benefits</u>[.]" J.A. 486 (line spacing altered); *see also* J.A. 506, 524, 542, 560.

The PowerPoint presentation also complained about the impact of government regulation on the coal industry and miners' livelihoods. *See* J.A. 487–89; *see also* J.A. 507–09, 525–27, 543–45, 561–63. Murray explained that "Only" the miners could "Save" their jobs, J.A. 489; *see also* J.A. 509, 527, 545, 563, and went on to berate the miners for low production rates, inefficiencies, drug and alcohol use, and "Out of Control" employee absences, J.A. 495–96; *see also* J.A. 490–94, 510–15, 528–33, 546–51, 564–69.

Three PowerPoint slides addressed Section 103(g) complaints:

> You Must Report Unsafe Situations and Compliance Issues to Management so that they Can Be Addressed By Management
>
> 103(g) Complaints Relative to the Mine Safety and Health Administration ("MSHA") Are Your Right
> Your Company Will Never Interfere With This In Any Way
> But, you Are Also Required To Make the Same Report to Management
>
> There Are High Percentages of Negative Findings from MSHA on the 103(g) complaints
> This Indicates That This Right Is Being Used To Get Back At Management Regarding Something That You Disagree With That Has Nothing To Do With Safety
> This Dilutes Company and MSHA Resources
> It Hurts your Company and Job Survival.

J.A. 497; *see also* J.A. 515–16, 534, 551–52, 569–70.

### C. Procedural History

#### 1. *The complaint, hearing, and ALJ's first decision*

Following the Awareness Meetings, several miners and a union representative filed complaints with the Secretary, alleging that Petitioners had interfered with their right to make Section 103(g) complaints. *See* 30 U.S.C. § 815(c)(2) (giving miners the right to file a complaint with the Secretary to report a Section 105(c)(1) violation). The Secretary then filed a complaint on their behalf with the Commission. The Secretary requested various forms of relief, including a civil penalty of $20,000 per violation and an order requiring "the reading by a Murray Energy corporate officer of a notice to all miners regarding the Section 105(c) violations." J.A. 19.

Shortly before the scheduled hearing before an ALJ, Petitioners and related mining companies filed a complaint in federal district court against the UMWA, a local UMWA chapter, and one of the complainants in this case. The federal court complaint – which included quotes from the depositions of several complainants in this case – alleged a breach of the collective bargaining agreement between the UMWA and coal mine operators, including Petitioners, based on miners' filing Section 103(g) complaints with MSHA without first raising the issues with mine management. The Secretary moved to cancel the administrative hearing on the grounds that the witnesses were intimidated by the lawsuit.

The ALJ then held a hearing during which no witnesses were called, and joint stipulations of fact and exhibits were admitted into the record. During the proceeding, the Secretary sought to amend the complaint to request that Murray himself be required to read the notice to all miners. Petitioners objected that requiring Murray to read the notice was "over the top" and

stated, "[W]e'll deal with the amendment. We can answer it." J.A. 374. Petitioners, however, did not address the issue in their post-hearing brief.

The ALJ subsequently issued a decision finding Petitioners liable for interference. *See McGary v. Marshall Cty. Coal Co.* (*McGary I*), 37 FMSHRC 2597, 2599 (2015). She explained that a reasonable miner would have left an Awareness Meeting thinking that mine management was hostile to the Section 103(g) complaint process, particularly with regard to how miners had been exercising their rights. *Id.* at 2606. The ALJ also found that a reasonable miner would have concluded that the mine operators had established a rule requiring that any Section 103(g) complaint be reported to management, thereby risking exposure of the miner's identity and undermining the Mine Act's guarantee of anonymity. *Id.* at 2606–07. The ALJ additionally found that the announced policy did not serve the mine operators' purported goal of being informed of unsafe conditions. *Id.* at 2607–08. In making these findings, the ALJ cited the PowerPoint slides as well as a recording of Murray's remarks from one of the meetings. *Id.* at 2606–07.

In finding interference under Section 105(c)(1), the ALJ applied a test proposed by the Secretary and adopted by two Commissioners in *Franks v. Emerald Coal Resources, LP*, 36 FMSHRC 2088 (2014), *vacated and remanded sub nom. Emerald Coal Resources, LP v. Hoy*, 620 F. App'x 127 (3d Cir. 2015). *See McGary I*, 37 FMSHRC at 2603. Under the *Franks* test, an interference violation occurs if

> (1) a person's action can be reasonably viewed, from the perspective of members of the protected class and under the totality of the circumstances, as tending to interfere with the exercise of protected rights, and

> (2) the person fails to justify the action with a legitimate and substantial reason whose importance outweighs the harm caused to the exercise of protected rights[.]

*Franks,* 36 FMSHRC at 2108 (opinion of Jordan, Chairman, and Nakamura, Comm'r). Unlike the test for discrimination claims under Section 105(c)(1), the *Franks* test for interference does not require a finding that the employer was motivated by miners' exercise of their protected rights.

There is nothing in the record to indicate that Petitioners objected to the ALJ's application of the *Franks* test. In a footnote in their post-hearing brief, Petitioners took issue with the "questionable" precedential value of *Franks*, noting that "only two Commissioners joined in that portion of the decision that utilized the test." J.A. 160 n.7. However, Petitioners did not ask the ALJ to apply an alternative test for interference, and they accepted Commission precedent as standing for the proposition that "the motive of an operator in taking any action is *not* considered when undertaking analysis of an interference claim." J.A. 158 n. 5 (emphasis in original); *see also* J.A. 159–60.

After finding interference, the ALJ ordered Petitioners to pay a $30,000 civil penalty for each violation, which was higher than what the Secretary had proposed. *McGary I*, 37 FMSHRC at 2609–10. The ALJ justified the increase by concluding that Petitioners had brought the federal court lawsuit to intimidate the witnesses in this case. *Id.* Petitioners were also instructed to post notices explaining miners' Section 103(g) rights and stating that there is no requirement or expectation that miners make the same report to management. *Id.* at 2609.

Finally, the ALJ granted the Secretary's request that Murray be required to hold a meeting at each mine and read a "prepared and approved statement" regarding the violations, "notifying miners that they are not required to contact management when making a complaint to MSHA." *Id.* The ALJ concluded that she had the authority to order this reading under both the Mine Act and this court's case law under the National Labor Relations Act ("NLRA"). *Id.* at 2608.

## 2. *Review by the Commission*

Petitioners sought review by the Commission, claiming that the record did not support the ALJ's finding of interference. Petitioners also asserted that mine operators may permissibly require their workers to report safety concerns to management. And they raised evidentiary challenges to the ALJ's findings relating to Petitioners' action in federal district court and the recording of Murray's remarks at one of the Awareness Meetings. Petitioners argued that the penalty "singl[ing] out" Murray to read the statement was "improper" because the recording was inadmissible. J.A. 226. Petitioners made no objection to the ALJ's application of the *Franks* test except to note, in their reply brief, that the case lacked precedential value. And Petitioners not only failed to propose any alternative to the *Franks* test, but they also continued to assert that proof of an operator's motive is *not* essential for interference claims.

Regarding remedies, Petitioners first claimed that the ALJ improperly considered their federal court action in justifying an increase in the assessed monetary penalty. As to the reading requirement, Petitioners simply pointed out that "there is no indication as to who will 'prepare' or 'approve' the statements to be read." J.A. 194, 227. Petitioners did not object to a reading

requirement, however. Rather, in their reply brief, Petitioners merely requested that Murray's statement be identical to the notices posted at each of the mines, claiming that any additions by the Secretary "would allow for extraneous material which was not included in the ALJ's decision to be injected into the statement." J.A. 338.

The Commission upheld the ALJ's determination that Petitioners impermissibly interfered with the rights of miners to make anonymous Section 103(g) complaints. *McGary v. Marshall Cty. Coal Co.* (*McGary II*), 38 FMSHRC 2006, 2027 (2016); *id.* at 2028 (Jordan, Chairman, and Cohen, Comm'r, concurring in part and dissenting in part). With regard to the test for interference claims, Chairman Jordan and Commissioner Nakamura affirmed the ALJ's application of the *Franks* test. *Id.* at 2012 n.11; *id.* at 2028 n.22 (Jordan, Chairman, and Cohen, Comm'r, concurring in part and dissenting in part). Commissioner Cohen also upheld the ALJ's reliance on *Franks* because Petitioners did not challenge the test before the ALJ and the issue was not briefed. *Id.* at 2028 n. 22 (Jordan, Chairman, and Cohen, Comm'r, concurring in part and dissenting in part). Commissioners Young and Althen found it unnecessary to settle upon a final, specific test because the result would be the same under the test set out by an ALJ in *Pepin v. Empire Iron Range Mining Partnership*, 38 FMSHRC 1435 (2016), which, unlike *Franks*, requires a finding that any alleged interference was motivated by the exercise of protected rights. *McGary II*, 38 FMSHRC at 2012 n.11. The Commission declined to address Petitioners' evidentiary challenge to the recording of Murray's remarks, concluding that the PowerPoint slides alone constituted substantial evidence supporting the finding of interference. *Id.* at 2019.

The Commission vacated the monetary penalties imposed by the ALJ and remanded the case for a reassessment that did not take into account Petitioners' federal court lawsuit. *Id.* at 2025–26. The ALJ was also instructed to clarify the details of Murray's "prepared and approved" statement. *Id.* at 2026.

3. *Proceedings following remand*

Before the ALJ on remand, Petitioners argued that there were no reasonable grounds for increasing the monetary penalties. Regarding the "content of a statement to be read" by Murray, J.A. 349, Petitioners asked the ALJ to reject the Secretary's request to draft a statement that would include language beyond what was in the notices posted at the mines. The Secretary wanted Murray to address the negative tone that he used at the Awareness Meetings and admit liability, but Petitioners objected that such additions "would simply be punitive . . . and be outside the scope of the remanded issue regarding who should 'prepare and approve' the statement." J.A. 350–51. In a footnote in their brief to the ALJ, Petitioners

> wish[ed] to note for the record that compelling a reading of a statement by an individual implicates First Amendment protections, and that if the Secretary seeks to include further material or content, such content could potentially constitute compelled speech, if the reading of a statement authored solely by the government and ordered to be read by an individual does not already implicate such concerns.

J.A. 351 n.6.

After reviewing the parties' positions, the ALJ assessed a penalty of $20,000 per violation. *McGary v. Marshall Cty. Coal Co.* (*McGary III*), 38 FMSHRC 2694, 2698 (2016).

Regarding Murray's statement, the ALJ explained that "the original order required that it be approved by all parties," but "the parties have not been able to agree on such language." *Id.* at 2699. Rejecting the parties' proposals, the ALJ instructed Murray to state that Petitioners violated the Mine Act; that the Commission ordered him to read the notice; that the policy announced at the Awareness Meetings is rescinded; and that miners are not required to contact management when making a complaint to MSHA. *Id.* The statement also included a summary of miners' rights under Sections 103(g) and 105(c). *Id.* at 2699–700.

Petitioners again appealed to the Commission, contending that the ALJ's assessment of monetary penalties was improper under the Mine Act. *See* 30 U.S.C. § 820(i) (enumerating six factors the Commission is required to consider when assessing civil monetary penalties). They also argued that the requirement of a personal reading was punitive rather than remedial in nature, in violation of the Mine Act and this court's case law under the NLRA. Petitioners also asserted that, "[t]o the extent that the statement contains editorial comments which may be contrary to views held by Mr. Murray, and is not a mere statement of the law, such portions of the statement could be viewed as compelled speech." J.A. 368.

The Commission declined to review Petitioners' objection to the monetary penalties. *See McGary v. Marshall Cty. Coal Co.* (*McGary IV*), 40 FMSHRC 261, 264 (2018); *see also* 30 U.S.C. § 823(d)(2)(A)(i) ("Review by the Commission shall not be a matter of right but of the sound discretion of the Commission."). As to the order requiring Murray to read the prepared statement, the Commission held that Petitioners had forfeited their arguments by failing to raise them in the prior proceedings. *See McGary IV*, 40 FMSHRC at 269.

Petitioners now seek review in this court, where they challenge the legality of the *Franks* test for interference claims, the Commission's finding of interference, the assessment of monetary penalties, and the order instructing Murray to read the prepared statement.

## II. ANALYSIS

### A. Standard of Review

"We review the legal determinations of the Commission and its ALJs *de novo* and factual findings for substantial evidentiary support." *Prairie State Generating Co. v. Sec'y of Labor*, 792 F.3d 82, 89 (D.C. Cir. 2015). Under the substantial evidence standard of review, which is "highly deferential," this court "may not reject reasonable findings and conclusions, even if we would have weighed the evidence differently." *Cumberland Coal Res., LP v. Fed. Mine Safety & Health Review Comm'n*, 717 F.3d 1020, 1028 (D.C. Cir. 2013) (citation omitted). Thus, the question is "whether a theoretical reasonable factfinder could have reached the conclusions actually reached by the Commission and the ALJ." *Id.* (citation omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

### B. Substantial Evidence Supports the Finding of Interference Under Section 105(c)(1)

On the record before us, and for the reasons given by the Commission, it is quite clear that Petitioners violated Section 105(c)(1).

We begin with the first prong of the *Franks* test and find no error in the Commission's determination that the Awareness Meetings could be reasonably viewed, from the perspective of

the miners and under the totality of the circumstances, as tending to interfere with the miners' exercise of Section 103(g) rights. *See McGary II*, 38 FMSHRC at 2015–19; *McGary I*, 37 FMSHRC at 2605–07. Petitioners raise three challenges to this finding, all of which lack merit.

First, because the purported theme was "mutual trust," Petitioners contend that their PowerPoint presentations cannot reasonably be interpreted to reflect an attempt to interfere with miners' rights. According to Petitioners, they merely sought to promote cooperation between miners and management. To support this claim, they point out that only 3 of the 77 PowerPoint slides addressed Section 103(g) complaints and that these slides expressly recognized the miners' rights to file complaints with MSHA. These arguments fail.

Under our deferential standard of review, we decline to disturb the Commission's eminently reasonable findings, which properly considered the totality of the circumstances. *See Wilson v. Fed. Mine Safety & Health Review Comm'n*, 863 F.3d 876, 881 (D.C. Cir. 2017) ("The Commission has instructed that . . . [']the [ALJ] should . . . analyze[ ] the totality of circumstances surrounding [the] statements' to determine whether a violation of Section 105(c) occurred." (alterations in original) (quoting *Gray v. N. Star Mining, Inc.*, 27 FMSHRC 1, 10 (2005))); *Moses v. Whitley Dev. Corp.*, 4 FMSHRC 1475, 1479 n.8 (1982), *aff'd*, 770 F.2d 168 (6th Cir. 1985) (per curiam) ("Whether an operator's actions are proscribed by the Mine Act must be determined by what is said and done, and by the circumstances surrounding the words and actions.").

While it is true that several of the PowerPoint slides referred to cooperation and "mutual trust," the general tenor of the meetings, along with statements on the slides, was intimidating and threatening. Miners were repeatedly told that

their jobs, futures, and family livelihoods were at risk. The miners were berated for absenteeism and low productivity, among other things, and reminded of how much worse off they would be if the mines were to close in an area where there is no comparable alternative employment. When Petitioners' presentation turned to Section 103(g), the slides conveyed management's belief that frivolous complaints were being used to get back at the mine operators, diluting MSHA resources, hurting the company, and jeopardizing the survival of the miners' jobs. As the Commission explained, "Tying the survival of employment opportunities at the mine to use of the section 103(g) process only when it is vindicated by the issue of a citation by MSHA would tend to discourage a reasonable miner from making a section 103(g) complaint in the first instance." *McGary II*, 38 FMSHRC at 2018. Under the totality of the circumstances, a reasonable miner could have concluded that management was interfering with the Section 103(g) complaint process.

Second, Petitioners insist that the Awareness Meetings did not create a "new" work rule requiring miners to report Section 103(g) complaints because the applicable collective bargaining agreement already required miners to report dangerous conditions to management. But requiring miners to report hazardous conditions is not equivalent to requiring miners who file Section 103(g) complaints to make "the same" report to management. This is because miners also have the right to report *non-hazardous* conditions to MSHA. *See* 30 U.S.C. § 813(g)(1) (allowing miners to report "a violation of this chapter or a mandatory health or safety standard . . . *or* an imminent danger" (emphasis added)). Furthermore, miners may opt to file a report with MSHA without simultaneously reporting their MSHA complaints to management. The critical point here is that, at the Awareness Meetings, Murray indicated to the miners that their continued employment was in jeopardy

because of their putative overuse of the Section 103(g) process. The overall effect of the Awareness Meetings was to discourage miners from filing complaints pursuant to their rights under the Act.

Third, Petitioners claim that the Awareness Meetings could not have established a new policy because safety rules can be implemented only through the procedure required by the collective bargaining agreement. According to Petitioners, the named complainants in this case would not have believed that Murray was announcing a new rule because they are experienced union officials with substantial knowledge of this rulemaking procedure.

The ALJ properly rejected this argument on the ground that, under *Franks*, "the relevant perspective on the issue is that of a reasonable miner," and "a reasonable miner would have thought that a statement made by the CEO of the company at an all-staff mandatory meeting constituted binding company policy." *McGary I*, 37 FMSHRC at 2607; *see also Wilson*, 863 F.3d at 882 ("[T]he Secretary's interference test is objective, and the Commission has instructed that the relevant perspective on the issue is that of the reasonable miner . . . not the subjective perspective of the complainant." (citation omitted)). The slides stated that miners were "Required To Make the Same Report to Management," with "Required" displayed in red. *E.g.*, J.A. 497. Given the choice between cooperating with management and losing his job, a reasonable miner could have felt pressured to comply with the announced policy. As the Commission explained, it would be "unreasonable" to assume that the average miner "would be so confident in his or her understanding of the applicable [collective bargaining agreement] that the miner would ignore the clear statements made in the slide presentation given by the company's CEO." *McGary II*, 38 FMSHRC at 2017; *see also Wilson*, 863 F.3d at

882 ("In the context of interference, the Commission typically considers the nature of the parties' relationship and whether the respondent holds a supervisory position." (alterations and citation omitted)).

Turning to the second prong of *Franks*, the Commission reasonably concluded that Petitioners failed to justify the policy with a legitimate and substantial reason whose importance outweighed the harm caused. *See McGary II*, 38 FMSHRC at 2019–21. While Petitioners have a legitimate interest in knowing about dangerous conditions at the mines, the Awareness Meetings were not aimed at encouraging miners to report hazards to management. On the contrary, as the Commission found, the general tenor of the PowerPoint slides and Murray's attitude toward the Section 103(g) process would have dissuaded miners from making complaints. Moreover, Petitioners' announced policy did not require miners to report *all* safety and health hazards to management, but rather only those that miners reported to MSHA. And, crucially, at no point in the presentation did Murray explain how the company planned to protect the miners' rights to anonymity under Section 103(g) while requiring them to make the "same" reports to management.

We are not persuaded by Petitioners' argument that *Pack v. Maynard Branch Dredging Co.*, 11 FMSHRC 168 (1989), *aff'd*, 896 F.2d 599 (D.C. Cir. 1990), dictates a different result. In *Pack*, a mine operator was not held liable for discrimination under Section 105(c)(1) after firing a worker who had failed to report improperly-stored explosives, where the company had a policy requiring employees to report dangerous conditions to management. *Id.* at 168–69. The Commission explained that the complainant was a security guard whose "essential duty" was reporting security breaches. *Id.* at 173; *see also id.* ("Pack's failure to perform the essence of his job, that of

reporting security breaches, exposed other miners to the risk of injury, and it was that breach that cost him his job."). The Commission also stressed that the company's "policy only required employees to report dangerous conditions to the company, and contained no instructions or prohibitions as to employees' actions vis-a-vis MSHA." *Id.* In contrast, the Awareness Meetings specifically addressed the MSHA complaint process, stating that miners must make the same report to management, and generally discouraged miners from filing complaints with the agency. The chilling effect of Petitioners' presentations and the failure to protect miner anonymity clearly outweighed any legitimate business interest the policy would have achieved.

## C. We Decline to Decide Whether the *Franks* Test is the Proper Test for Interference Claims

It is beyond dispute that the Commission's finding of interference in this case was supported by substantial evidence under any applicable test construing Section 105(c)(1). Petitioners argue that *Franks* is not a valid test for interference claims because it fails to adhere to the plain language of Section 105(c)(1), which, according to Petitioners, requires proof of an operator's motivation to interfere with protected rights. In asking this court to account for motive, Petitioners cite a test applied by an ALJ in *Pepin v. Empire Iron Range Mining Partnership*, 38 FMSHRC 1435 (2016), under which

> the Secretary must show that (1) the [mine operator's] actions can be reasonably viewed, from the perspective of members of the protected class and under the totality of the circumstances, as tending to interfere with the exercise of protected rights, and that (2) such actions were motivated by the exercise of protected rights.

*Id.* at 1453–54 (footnote omitted).

Even assuming that Petitioners preserved this objection, and without passing on the validity of the test set forth in *Pepin*, Petitioners cannot possibly prevail given the substantial evidence that the Awareness Meetings were motivated by the miners' exercise of Section 103(g) rights. Both the ALJ and the Commission rejected Petitioners' argument that the sole purpose of the presentations was to promote cooperation between miners and management. Substantial evidence supports their determinations.

Following Petitioners' acquisition of the mines, workers reported dozens of safety issues to MSHA, leading to numerous citations. The Awareness Meetings laid bare Murray's resentment of those complaints. Murray explicitly criticized the volume of confidential Section 103(g) complaints. At oral argument, counsel for Petitioners took the position that Murray was prompted to hold the Awareness Meetings because miners were filing Section 103(g) complaints that, in Petitioners' view, had no safety merit, *see* Oral Argument at 10:34–12:33, and were "being used to get back at management," *e.g.*, J.A. 497 (formatting omitted). But the Mine Act protects miners who file complaints when they have "reasonable grounds to believe" a violation exists, 30 U.S.C. § 813(g)(1), even if the miner is ultimately incorrect. Furthermore, Petitioners' policy applied across the board to all Section 103(g) filings, not just ones claimed to be wholly meritless or pretextual. And to the extent that there was no safety merit to the complaints, Petitioners had no safety interest in having the miners report their complaints to management. The record makes it clear that Petitioners, in stating that the way miners had made complaints threatened their job survival, "were trying to intimidate miners from using section 103(g)." *McGary II*, 38 FMSHRC at 2021.

As the ALJ explained, "While Murray stated that he had no intention to interfere with miners' rights, the statement had little force when considered in the context of the rest of Murray's speech." *McGary I*, 37 FMSHRC at 2606. Accordingly, both the ALJ and the Commission reasonably described Murray's statements as "calculated to discourage miners from using the MSHA complaint process." *Id.* at 2608; *McGary II*, 38 FMSHRC at 2021.

Because the Awareness Meetings were motivated by the filing of Section 103(g) complaints, the facts of this case do not require us to review the *Franks* test for interference claims. *See McGary II*, 38 FMSHRC at 2012 n.11 (Althen and Young, Comm'rs) (finding it unnecessary to settle upon a test for interference in this case because applying *Franks* or *Pepin* would yield the same result).

Moreover, in the proceedings below, Petitioners never objected to the *Franks* test as failing to account for the operator's motive. *See id.* at 2028 n.22 (Cohen, Comm'r) (applying *Franks* because Petitioners did not challenge it in the proceedings before the ALJ and the issue was not briefed). Under the Mine Act, if a party fails to bring a challenge before the ALJ, it is forfeited before the Commission except for good cause shown. *See* 30 U.S.C. § 823(d)(2)(A)(iii). And "[n]o objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." *Id.* § 816(a)(1). These statutory requirements "ensure that the Commission has the first opportunity to correct its own errors" and "advance the efficient disposition of litigation." *Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 673 (6th Cir. 2018).

In a footnote in their post-hearing brief to the ALJ, and in their reply brief before the Commission, Petitioners called into question *Franks'* precedential value. *See* J.A. 160 n.7, 321–23. But at no point did they ask the Commission to apply a test other than *Franks* to account for motive. On the contrary, Petitioners repeatedly asserted that proof of an operator's intent is *not* necessary to establish interference under Commission precedent. *See* J.A. 158–60, 189, 216–17, 336. Without a consistent, clearly-articulated position by Petitioners, we decline to address their belated challenge to the *Franks* test.

For these reasons, we uphold the Commission's conclusion that Petitioners violated Section 105(c)(1) of the Mine Act by interfering with miners' rights to make anonymous complaints to MSHA under Section 103(g).

## D. The ALJ Properly Considered the Statutory Criteria for Monetary Penalties

Petitioners take issue with the ALJ's assessment of $20,000 per violation and the Commission's failure to review it. Under the Mine Act, the Commission is required to consider six factors before imposing monetary penalties:

> the operator's history of previous violations, the appropriateness of such penalty to the size of the business of the operator charged, whether the operator was negligent, the effect on the operator's ability to continue in business, the gravity of the violation, and the demonstrated good faith of the person charged in attempting to achieve rapid compliance after notification of a violation.

30 U.S.C. § 820(i).

According to Petitioners, the ALJ did not properly address all six factors and overlooked mitigating evidence, including the lack of previous interference violations at the mines; the absence of any attempt to enforce the reporting policy; evidence relevant to good-faith abatement of the violation; their compliance with the notice-posting requirement that the ALJ ordered in her initial decision; and their good-faith basis for requesting that miners report safety issues. These arguments are unpersuasive.

The ALJ acknowledged that the mines had no history of interference violations. *McGary III*, 38 FMSHRC at 2698. With respect to good-faith abatement, she further noted that Petitioners had not investigated or disciplined any miners for violating the reporting requirement. *Id.* But there was no evidence that Petitioners had taken any steps to rescind the policy. *Id.* Moreover, the ALJ found the gravity of the violation particularly significant because Murray, the company's CEO, announced the policy during meetings that all miners were required to attend; and the messages conveyed in the presentations reasonably could have been, and likely were, understood as threats to the miners' employment. *Id.* Additionally, the ALJ determined Petitioners were negligent in the intimidating and threatening manner in which the policy was presented. *Id.* And, for the reasons stated above, any good-faith basis Petitioners may have had for requesting that miners inform management about safety issues did not outweigh the harm caused by the Awareness Meetings. There is no doubt that the ALJ's assessment of penalties was proper under 30 U.S.C. § 820(i). *See Cordero Mining LLC v. Sec'y of Labor*, 699 F.3d 1232, 1238–39 (10th Cir. 2012) (upholding a penalty where the ALJ considered each of the six statutory factors, while choosing to focus on certain ones, and substantial evidence supported the factual findings).

Petitioners also claim that the Commission erred in failing to review the ALJ's decision, but this argument is misguided. Under the Act, "[r]eview by the Commission shall not be a matter of right but of the sound discretion of the Commission." 30 U.S.C. § 823(d)(2)(A)(i); *see also id.* § 823(d)(2)(B) ("[T]he Commission may in its discretion . . . order the case before it for review but only upon the ground that the decision may be contrary to law or Commission policy, or that a novel question of policy has been presented."). If the Commission declines review, the ALJ's decision becomes the final decision of the Commission 40 days after its issuance. *Id.* § 823(d)(1). This court has jurisdiction over final orders. *See id.* § 816(a)(1). In these circumstances, we review the ALJ's decision as the final order of the Commission, not the Commission's refusal to grant review.

### E. Petitioners Forfeited Their Challenges to the Personal Reading Requirement

Before this court, Petitioners make two challenges to the order requiring Murray to read the ALJ's prepared statement to all miners. They argue that this remedy constitutes government-compelled speech, compromising Murray's First Amendment rights. And, relying on this court's case law under the NLRA, they claim that the Commission lacks the authority under the Mine Act to order the reading of a prepared statement because that remedy is punitive rather than remedial. However, Petitioners forfeited these objections by failing to raise them in the first proceeding before the ALJ, in their first appeal to the Commission, and again when the case was remanded to the ALJ. *See* 30 U.S.C. § 823(d)(2)(A)(iii); *id.* § 816(a)(1).

Petitioners could have objected to the reading during the initial proceeding before the ALJ, as the Secretary's complaint requested that a company official be required to read a notice

regarding the violations. When the Secretary requested at the hearing that Murray himself be ordered to read the statement, counsel for Petitioners vaguely protested that the remedy was "over the top," J.A. 374, but then entirely failed to address the issue in their post-hearing brief.

In their first petition for discretionary review, Petitioners did not challenge the conclusion by the ALJ that, based on this court's NLRA precedent, she had authority under the Mine Act to order Murray to read a statement to all miners. *See McGary I*, 37 FMSHRC at 2608. They objected only to the ALJ's failure to indicate who would prepare and approve it. Their sole First Amendment claim concerned the ALJ's consideration of Petitioners' federal court lawsuit and did not mention the reading requirement. Then, in their opening brief to the Commission, Petitioners made no additional arguments concerning the personal reading except to note that it was "improper" because the recording of Murray's remarks at an Awareness Meeting was improperly admitted into evidence. J.A. 226. In their reply brief, Petitioners simply asked that Murray's statement be identical to the notices posted at the mines.

Petitioners again failed to raise their constitutional and statutory challenges after the case was remanded to the ALJ. Asking that Murray be ordered to read only the notice that had already been posted at the mines, they explained that "any additional language inserted by the Secretary would have the aim of being punitive" and thereby "go beyond the remedial aim of the Mine Act." J.A. 349–50. But at no point did they address any of this court's case law under the NLRA – on which the ALJ relied in her first decision – to object to the allegedly punitive nature of the remedy. Moreover, their argument focused on the possibility that the Secretary would dictate the substance of Murray's statement, but the ALJ

mooted that concern by rejecting the Secretary's proposal and drafting her own statement. *See McGary III*, 38 FMSHRC at 2699–700. In a footnote, Petitioners mentioned that a compelled reading "implicates First Amendment protections" and "could potentially constitute compelled speech." J.A. 351 n.6. But this was hardly sufficient to put the ALJ on notice that Petitioners were raising a new constitutional argument. *See CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("A footnote is no place to make a substantive legal argument on appeal; hiding an argument there and then articulating it in only a conclusory fashion results in forfeiture.").

We also reject Petitioners' contention that the ALJ's second decision "announced an entirely new remedy implicating a new set of constitutional and statutory considerations." Pet'rs' Br. 44. Petitioners' belated argument to this court that the Mine Act does not allow the Commission to order a compelled reading could easily have been raised as soon as the reading remedy was proposed. And to the extent Petitioners were concerned that a statement drafted by the Commission would constitute compelled speech in violation of the First Amendment, they could have raised this argument when they initially objected to the lack of clarity as to who would prepare and approve the statement. Petitioners had ample opportunity in the proceedings before the ALJ and the Commission to raise the constitutional and statutory challenges that they now press before this court, but failed to do so.

### III. Conclusion

For the reasons set forth above, we deny the petition for review.

*So ordered*.